Michael C. Zogby
Kaitlyn E. Stone
BARNES & THORNBURG LLP
1776 on the Green
67 E. Park Place
Morristown, New Jersey 07960
Tel. (973) 775-6110
Fax: (973) 775-6102
michael.zogby@btlaw.com
kaitlyn.stone@btlaw.com

*Attorneys for*
*The Dow Chemical Company*

## UNITED STATES DISTRICT COURT
## FOR DISTRICT OF NEW JERSEY

| | |
|---|---|
| ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND; and ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS, <br><br> Plaintiffs, <br><br> v. <br><br> THE DOW CHEMICAL COMPANY, VIBRANTZ CORPORATION f/k/a FERRO CORPORATION, LEGACY VULCAN LLC f/k/a VULCAN MATERIALS COMPANY, and "ABC CORPORATIONS" 1–10 (NAMES FICTITIOUS), <br><br> Defendants. | Civil Action No.: <br><br> **NOTICE OF REMOVAL** <br><br> Removed From: <br><br> Superior Court of New Jersey Mercer County – Law Division Docket No. MER-L-000552-23 |

Defendant The Dow Chemical Company ("Dow"), pursuant to 28 U.S.C. §§ 1441, 1442, and 1446, hereby removes the above-captioned action and all claims and causes of action from the Superior Court of New Jersey, Mercer County, to the United States District Court for the District of New Jersey. By filing this Notice of Removal, Dow does not waive, but rather expressly preserves, any and all rights and defenses to which it may be entitled in this action. As grounds for removal, and taking as true the allegations in the Complaint,[1] Dow states as follows:

## I.   BACKGROUND

### A.   Overview of the Action

1.   On March 23, 2023, the Attorney General of the State of New Jersey, the New Jersey Department of Environmental Protection, the Commissioner of the New Jersey Department of Environmental Protection, the Administrator of the New Jersey Spill Compensation Fund, and the Acting Director of the New Jersey Division of Consumer Affairs (collectively, the "State") filed the Complaint in the Superior Court of New Jersey, Mercer County, Docket No. MER-L-000552-23, against Defendants Dow, Vibrantz Corporation, Legacy Vulcan LLC ("Vulcan"), and "ABC Corporations" 1–10. *See* Certification of Michael C. Zogby in Support of Defendant The Dow Chemical Company's Notice of Removal ("Zogby Cert."), Ex. A, Compl.

---

[1] While Dow disputes the factual allegations asserted in the Complaint, for purposes of removal only, Dow accepts those allegations as true. *See Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987).

2.      The Complaint alleges statewide 1,4-dioxane contamination in New Jersey, including in groundwater, surface water, drinking water, and other natural resources. Zogby Cert., Ex. A, Compl., ¶ 9. According to the State, this alleged contamination exists at more than 700 sites across every county in New Jersey and resulted from the use of products containing 1,4-dioxane by others—not by Dow or the other Defendants. *Id.* ¶¶ 10, 21. The State alleges that the principal 1,4-dioxane-containing product that led to this alleged statewide contamination is 1,1,1-trichloroethane ("TCA"), an organochloride solvent used to dissolve oil and grease from metal, among other uses. *Id.* ¶ 32. Despite alleging statewide contamination purportedly present at more than 700 locations, the State does not identify any specific contaminated site(s) and does not identify (or sue) any of the parties that actually discharged 1,4-dioxane into the environment. Rather, the State has chosen to sue Defendants, which the State asserts designed, manufactured, marketed, distributed, and/or sold 1,4-dioxane-containing products to others in New Jersey. *Id.* ¶ 20.

3.      The State asserts claims of strict liability, negligence, public nuisance, trespass, impairment of the public trust, and violations of the New Jersey Spill Compensation and Control Act (the "Spill Act"), N.J.S.A. § 58:10-23.11 *et seq.*, and the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-2 *et seq.* Through

these claims, the State seeks several categories of relief. *See, e.g.*, Zogby Cert., Ex. A, Compl., ¶ 113.

4.      For all of its claims, except its NJCFA claim, the State seeks a judgment holding Defendants liable and ordering that Defendants pay all costs "related to the investigation, cleanup, restoration, treatment, and monitoring of 1,4-dioxane contamination" in New Jersey. *See, e.g.*, *id.* ¶ 113.A–B. The State also seeks natural resource damages from Defendants, including the "full cost of restoring" natural resources allegedly injured by 1,4-dioxane and economic damages for the "lost value (including lost use)" of those natural resources. *See, e.g.*, *id.* ¶ 113.C–D. Finally, the State seeks punitive damages and reasonable attorneys' fees and costs. *See, e.g.*, *id.* ¶ 113.G–H.

5.      With respect to its NJCFA claim, which the State asserts against only Dow and Vulcan, the State requests judicial enjoinment of Dow and Vulcan from engaging in any activities that violate the Act. *Id.* ¶ 236.B. The State also requests that Dow and Vulcan be ordered to disgorge all funds and property acquired by allegedly violating the Act, and for the imposition of statutory civil penalties, costs, and fees. *Id.* ¶ 236.C–E.

**B.     Dow's Manufacture of Products Containing 1,4-Dioxane**

6.     Dow previously manufactured certain products containing 1,4-dioxane, including TCA, for use by the United States military. In so doing, Dow designed TCA to meet the specifications required by the United States Navy.

7.     Beginning in 1968, Dow manufactured TCA to meet military specification number MIL-T-81533A and federal specification number OT-620c.[2] The Navy promulgated these two specifications in 1967 after Los Angeles County, California passed Rule 66, which phased out the use of trichloroethylene ("TCE"), another solvent in the organochloride family, which had been used for vapor degreasing. *See* Zogby Cert., Ex. C, Rae E. Houke, Soc'y of Auto. Eng'rs, Effect of Los Angeles County Air Pollution Control District Rule 66 on Cleaning and Degreasing Operations (1967), at 2468; Zogby Cert., Ex. D, Military Specification MIL-T-81533A (Sept. 26, 1967), at 1; Zogby Cert., Ex. E, Federal Specification OT-620c (Sept. 13, 1967), at 1.

8.     To provide a replacement for TCE in vapor degreasing, the Navy in June 1967 promulgated military specification number MIL-T-81533, which was

---

[2] A military specification is prepared only by the military for materials that are intrinsically militaristic, while a federal specification can be prepared by either the military or another federal agency and is used primarily for commercial items of general application. *See* Zogby Cert., Ex. B, U.S. Army Logistics Mgmt. Ctr., Department of Defense Specification Development Guide (History, Purpose, Disciplines & Techniques) (1975) (excerpted), at 30–31.

developed "in coordination with industry." Zogby Cert., Ex. F, Dept. of Defense, Thirty-First Report to Congress of the Department of Defense on the Defense Cataloging and Standardization Act of 1952 (1968) (excerpted), at 9; *see also* Zogby Cert., Ex. D, MIL-T-81533A, at 1, 11. That specification was revised as MIL-T-81533A in September 1967, which specified a TCA product with certain required features for vapor degreasing. Zogby Cert., Ex. D, MIL-T-81533A, at 1. Also in 1967, the Navy promulgated federal specification number OT-620c, which specified a TCA product with certain required features for cold cleaning.[3] Zogby Cert., Ex. E, OT-620c, at 1–2, 9.

9.     The key feature of both MIL-T-81533A (the "MilSpec") and OT-620c (the "FedSpec") was the requirement of inhibiting the TCA, so that it would not corrode metals to which the TCA would be applied as a cleaning agent. *See* Zogby Cert., Ex. D, MIL-T-81533A, at 2–3; Zogby Cert., Ex. E, OT-620c, at 2. To meet this requirement, 1,4-dioxane was used to stabilize the TCA—a process patented by Dow. Zogby Cert., Ex. A, Compl., ¶ 33.

10.     In 1968, months after the promulgation of the MilSpec and FedSpec, Dow began manufacturing TCA to comply with those specifications and selling it under the trade name Chlorothene VG™. Dow's product literature at the time

---

[3] In "cold cleaning," a solvent, such as TCA, is kept below its boiling point while being used to dissolve grease and oil from metal.

described Chlorothene VG™ as designed for vapor degreasing and explicitly "meet[ing] the requirements of MIL-T-81533A" and "O-T-620C," including their particular stability and corrosion inhibiting specifications. Zogby Cert., Ex. G, Dow Chlorothene VG™ Vapor Degreasing Manual (1968) (excerpted), at 24. Dow specifically designed the inhibitor system of Chlorothene VG™ "to provide better corrosion protection and stability under vapor degreasing conditions," as required by the MilSpec and FedSpec. *Id.* at 2; Zogby Cert., Ex. D, MIL-T-81533A, at 2–3; Zogby Cert., Ex. E, OT-620c, at 2. In 1979, Dow introduced another 1,4-dioxane-stabilized TCA product, Chlorothene SM™, which likewise met the MilSpec and FedSpec requirements. *See* Zogby Cert., Ex. H, Dow Chlorothene SM™ Label (1979); Zogby Cert., Ex. I, Dow Chlorothene SM™ Label (1983).

11.    Based on Dow's manufacture and sale of 1,4-dioxane-stabilized TCA products, such as Chlorothene VG™ and Chlorothene SM™, the State alleges that Dow is responsible for the alleged 1,4-dioxane contamination throughout New Jersey. Zogby Cert., Ex. A, Compl., ¶¶ 49, 56. The State does not identify any specific contaminated site(s) in its Complaint, but TCA and 1,4-dioxane contamination has been identified at multiple military installations in New Jersey, including Joint Base McGuire-Dix-Lakehurst in Burlington County and Picatinny Arsenal in Rockaway Township. *See infra* ¶ 22. And TCA is listed as a contaminant of concern at the EPA Superfund site at Picatinny Arsenal as well as two other EPA

Superfund sites on military installations in New Jersey: the Fort Dix Landfill (Pemberton Township) and the Naval Air Engineering Center (Lakehurst). *See infra* ¶ 52.

## II.   GROUNDS FOR REMOVAL

12.    Dow removes this action to this Court on four independent grounds.

13.    *First*, the Court has subject matter jurisdiction over this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), because the State's claims are based, at least in part, on Dow's conduct when acting under the direction of the United States military; the State's claims are for or relating to Dow's conduct under color of federal office; Dow is a person under the federal officer removal statute; and Dow has a colorable federal defense (the government contractor defense) to the State's claims. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (setting out the four elements for federal officer removal).

14.    *Second*, there is federal subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1367, and 1441, and the doctrine set forth in *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), because the State's Spill Act claim raises a substantial federal question of whether the State's past and future cleanup and removal costs have complied, and will comply, with the federal National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. § 300 *et seq.*, for the investigation and remediation of

1,4-dioxane throughout New Jersey. *See Grable*, 545 U.S. at 314–15 (holding federal court had jurisdiction over plaintiff's state-law claim to quiet title where the claim was premised on compliance with federal notice statutes).

15.    *Third*, 28 U.S.C. §§ 1331, 1367, and 1441 and the *Grable* doctrine confer federal subject matter jurisdiction over this action because, in resolving the State's claims concerning natural resource damages, the Court necessarily will determine the extent of the State's trusteeship interest in each and every natural resource at issue in the Complaint compared to the concurrent trusteeship interests in those same natural resources held by multiple federal agencies. *See id.*

16.    *Fourth*, the Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1367, and 1441 because the State's claims pertain, at least in part, to injuries and relief that allegedly occurred on federal enclaves located in New Jersey.[4] *See* U.S. Const., art. I, § 8, cl. 17.

### A.    The Court Has Jurisdiction Under the Federal Officer Removal Statute

17.    Removal is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), because the State predicates certain liability theories on activities Dow undertook pursuant to federal government requirements.

---

[4] Although the State has attempted to disclaim federal enclave jurisdiction in the Complaint, that purported disclaimer is ineffective and inconsistent with breadth of the State's claims and requested relief. *See infra* ¶¶ 50–56.

18.    The federal officer removal statute gives federal courts jurisdiction over all actions against "any officer (or any person acting under that officer) of the United States or any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Jurisdiction under the federal officer removal statute is much broader than under the general removal statute, 28 U.S.C. § 1441. Federal officer removal is to be "broadly construed in favor of a federal forum" (*Papp*, 842 F.3d at 811), and "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)" (*Willingham v. Morgan*, 395 U.S. 402, 407 (1969)). A defendant seeking federal officer removal must show "(1) the defendant is a 'person' within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct 'acting under' the United States, its agencies, or its officers; (3) the plaintiff's claims against the defendant are 'for, or relating to' an act under color of federal office; and (4) the defendant raises a colorable federal defense to the plaintiff's claims." *Papp*, 842 F.3d at 812 (cleaned up).

19.    All four elements of federal officer removal are met here.

20.    *First*, Dow is a corporation and therefore a "person" under the statute. *Id.*

21.    *Second*, the State's claims are based, in part, on Dow's conduct "acting under" the United States, because Dow designed and manufactured its 1,4-dioxane-containing TCA products to meet the MilSpec and FedSpec and to

10

"assist, or to help carry out," the "duties or tasks" of a federal officer—the United States military. *Id.* at 812 (emphasis omitted). Indeed, Dow began manufacturing Chlorothene VG™ just months after the MilSpec and FedSpec were promulgated after their development "in coordination with industry." Zogby Cert., Ex. F, Thirty-First Report to Congress of the Department of Defense on the Defense Cataloging and Standardization Act of 1952, at 9; Zogby Cert., Ex. D, MIL-T-81533A, at 1; Zogby Cert., Ex. E, OT-620c, at 1. And without Dow's manufacture of Chlorothene VG™ and Chlorothene SM™, the government "would have otherwise used its own agents to complete" the manufacture of MilSpec- and FedSpec-compliant TCA. *Papp*, 842 F.3d at 812.

22.    *Third*, the State's claims against Dow are "for, or relating to" Dow's manufacture of TCA for the military because there is a "connection" between Dow's allegedly tortious conduct and the federal office. *Id.* at 813. The thrust of the State's claims against Dow is that (i) Dow's TCA was defectively designed (Zogby Cert., Ex. A, Compl., ¶¶ 95–113); (ii) Dow failed to warn of the dangers of TCA (*id.* ¶¶ 114–34); and (iii) as a result, natural resources throughout New Jersey have been allegedly injured and damaged by Dow's 1,4-dioxane-containing products (*id.* ¶¶ 9–10). Each of these points "relates to" the MilSpec and FedSpec because Dow's allegedly defective design of, and purportedly inadequate warnings for, TCA arise from the requirements of the MilSpec and FedSpec. And MilSpec- and FedSpec-

11

compliant TCA likely was used on military installations across New Jersey, as evidenced by multiple federal facilities with known TCA and 1,4-dioxane contamination. *See* Zogby Cert., Ex. J, Tim Llewellyn, Arcadis, 1,4-Dioxane Sampling Report, Joint Base McGuire-Dix-Lakehurst (Sept. 29, 2021) (excerpted), at 4–6 (describing 1,4-dioxane detections at Joint Base McGuire-Dix-Lakehurst and indicating TCA usage as the likely source); Zogby Cert., Ex. K, EA Eng'g, Sci., and Tech., Inc., 2018 Annual Monitoring Report, Group 3, Site 2 (PICA-008), Groundwater and Surface Water, Picatinny Arsenal (Nov. 2018) (excerpted), at 8, 16 (describing detections of 1,4-dioxane and TCA at Picatinny Arsenal).

23.     *Fourth*, Dow will raise a colorable federal defense—the government contractor defense—to the State's claims.

24.     Under the government contractor defense, a defendant is not liable for the design, manufacture, or warnings of equipment or supplies when (1) the government approved specifications for the product at issue, (2) the defendant followed those government specifications, and (3) the defendant informed the government about the hazards known to it, but not known to the government, or the defendant did not have "superior knowledge [that it] withheld from the government" about the product's hazards. *Papp*, 842 F.3d at 814.

25.     Dow satisfies the elements for a colorable government contractor defense. *Id.* (requiring that federal defense for federal officer removal be "colorable"

before removal is proper). As discussed above, the military approved specifications—the MilSpec and FedSpec—that governed the formulation, performance, testing, storage, inspection, packaging, and labeling of TCA. *See supra* ¶¶ 6–10. Dow manufactured Chlorothene VG™ and Chlorothene SM™ to meet these federal government specifications.

26.     Upon information and belief, Dow did not have superior knowledge of any risks potentially posed by TCA not known to the federal government, as evidenced by the federal government's published knowledge of 1,4-dioxane. *See* Zogby Cert., Ex. L, U.S. EPA, Preliminary Assessment of Suspected Carcinogens in Drinking Water: Report to Congress (Dec. 1975) (excerpted), at I-17, II-1, II-4 (including detections of 1,4-dioxane in report of known and suspected carcinogens); Zogby Cert., Ex. M, Nat'l Institute of Occupational Safety and Health, Criteria for a Recommended Standard . . . . Occupational Exposure to Dioxane (Sept. 1977) (excerpted), at 17, 117 (stating that "evidence from animal studies suggests that 1,4-dioxane is a carcinogen in man," and acknowledging that 1,4-dioxane was used as a TCA stabilizer); Zogby Cert., Ex. N, U.S. EPA, Health Assessment Document for 1,1,1-Trichloroethane (Methyl Chloroform) (Feb. 1984) (excerpted), at 3-27, 3-28, 5-62, 5-63 (reporting that TCA (or methyl chloroform, "MC") was found in groundwater and drinking water across the country, that 1,4-dioxane was a potential human carcinogen, and that 1,4-dioxane was used as a TCA stabilizer). And to the

extent Dow did know about potential risks of 1,4-dioxane in TCA products such as Chlorothene VG™ and Chlorothene SM™, it provided that information to the federal government. *See, e.g.*, Zogby Cert., Ex. O, Jan. 9, 1974 Corresp. from Robert J. Moolenaar, Environmental Affairs, The Dow Chemical Company, to Dr. John R. Goldsmith, National Institutes of Health.

27.     There is accordingly federal subject matter jurisdiction over this entire action under 28 U.S.C. § 1442(a)(1).

> **B.     The Court Has Jurisdiction Because the State's Spill Act Claim Raises a Substantial Federal Question of NCP Compliance.**

28.     This action independently is removable under 28 U.S.C. §§ 1331, 1367, and 1441 and the *Grable* doctrine, because the State's Spill Act claim raises a substantial federal question: whether the State's cleanup and removal activities have complied, and will comply, with the NCP.

29.     Section 1331 gives the Court original jurisdiction over all claims arising under the "laws . . . of the United States," including state-law claims where a federal issue is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Inselberg v. New York Football Giants, Inc.*, 661 F. App'x 776, 779 (3d Cir. 2016); *see also Grable*, 545 U.S. at 314. A federal issue is "necessarily raised" if vindication of a right under state law "necessarily turn[s] on some construction of federal law." *Ortiz v. Univ. of Med. & Dentistry of N.J.*, No. 08-2669

(JLL), 2009 WL 737046, at *7–8 (D.N.J. Mar. 18, 2009). And a federal issue is "actually disputed" and "substantial" if, "to prove some element of a state-law claim, the plaintiff ha[s] to win on an issue of federal law." *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 709 (3d Cir. 2022).

30.     The Spill Act expressly mandates that cleanup and removal costs are recoverable only if the underlying environmental work complies with the NCP. Specifically, the Spill Act requires that "[c]leanup and removal of hazardous substances and actions to minimize damage shall, to the greatest extent possible, be in accordance with the [NCP]." N.J.S.A. § 58:10-23.11f(a)(3).

31.     Whether the State has conducted, and will conduct, its "cleanup and removal" of 1,4-dioxane "in accordance" with the NCP presents a federal question because the NCP is a comprehensive federal regulatory scheme that governs the investigation and remediation of hazardous substances, including 1,4-dioxane, under CERCLA and other federal statutes. *See* 40 C.F.R. § 300.2 ("The NCP is required by section 105 of [CERCLA] and by section 311(d) of the Clean Water Act[.]"); 40 C.F.R. § 300.1 ("The purpose of the [NCP] is to provide the organizational structure and procedures for preparing and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants.").

32.     The State's ability to succeed on its Spill Act claim "turn[s] on"—and therefore "necessarily raises"—the federal issue of NCP compliance because NCP

compliance is required under the Spill Act. *Ortiz*, 2009 WL 737046, at *7–8. Without NCP compliance, the State's Spill Act claim fails. N.J.S.A. § 58:10-23.11f(a)(3) ("Cleanup and removal of hazardous substances and actions to minimize damage shall, to the greatest extent possible, be in accordance with the [NCP]."). For the same reason, NCP compliance for the State's Spill Act claim is also "actually disputed" and "substantial." *See City of Hoboken*, 45 F.4th at 709.

33.    Finally, the Court can resolve the State's Spill Act claim, including its NCP compliance requirement, without disrupting the "federal-state balance approved by Congress." *Inselberg*, 661 F. App'x at 779. Indeed, federal courts routinely adjudicate Spill Act claims. *See, e.g.*, *Pub. Serv. Elec. & Gas Co. v. Newport Assocs. Dev. Co.*, 365 F. Supp. 3d 506, 521–22 (D.N.J. 2019) (holding Spill Act claim subsumed plaintiff's trespass and nuisance claims); *Strategic Env't Partners, LLC v. New Jersey Dep't of Env't Prot.*, No. CV 12-3252, 2017 WL 4678199, at *8 (D.N.J. Oct. 16, 2017) (granting summary judgment of Spill Act claim). Further, the New Jersey legislature demonstrated its intent to apply federal law by expressly invoking the NCP (*i.e.*, a federal regulatory scheme) in adjudicating Spill Act claims. N.J.S.A. § 58:10-23.11f(a)(3). The State can hardly complain that a federal court would exercise jurisdiction over and adjudicate a claim that, by the New Jersey legislature's own express mandate, implicates a question of federal law.

34.     Thus, the State's Spill Act claim raises a substantial federal question that confers this Court original jurisdiction under 28 U.S.C. § 1331. And because the Court has jurisdiction over the Spill Act claim under 28 U.S.C. § 1331, the entire action may be removed to federal court under the Court's power to exercise supplemental jurisdiction over state-law claims. *See* 28 U.S.C. §§ 1367, 1441(c); *see also, e.g.*, *Boyd v. New Jersey Dep't of Corr.*, No. CIV. 12-6612 DRD, 2013 WL 1163507, at *5 (D.N.J. Mar. 18, 2013) (where one claim confers federal jurisdiction, the entire action can be removed pursuant to 28 U.S.C. § 1367).

### C.    The Court Has Jurisdiction Because the State's Claims Raise a Substantial Federal Question of Federal Trustees' Interests in the Natural Resources at Issue in the Complaint.

35.     All of the State's claims, except its claim under the NJCFA, "necessarily raise[]" the federal issue of the extent of federal trustees' concurrent interest in the natural resources the State has placed at issue in the Complaint. *Inselberg*, 661 F. App'x at 779. This issue is actually disputed, substantial, and the Court can resolve it without disrupting the "federal-state balance approved by Congress." *Id.*

36.     The State grounds its claims, at least in part, on the contention that "the State is the trustee of all natural resources within its jurisdiction for the benefit of its citizens." Zogby Cert., Ex. A, Compl., ¶ 16. But as it has admitted publicly, the State is not the only trustee of natural resources in New Jersey; rather, the federal

government has a concurrent trusteeship interest in certain natural resources in New Jersey. Zogby Cert., Ex. P, N.J. Dep't of Env't Prot., Administrative Order No. 2023-08, at 1.

37.    Less than two months ago, the New Jersey Department of Environmental Protection reaffirmed that "certain natural resources" in New Jersey are "held in trust by the federal government" and that the New Jersey "Commissioner of Environmental Protection may serve as a co-trustee together with federal trustees" for these natural resources. *Id.*

38.    The federal trustees and their interests in certain natural resources in New Jersey are governed by CERCLA through the NCP. *See* 40 C.F.R. § 300.600(b) (designating federal trustees of various natural resources).

39.    In particular, the Secretary of Commerce is the trustee of any natural resources in New Jersey that are "found in, under, or using waters navigable by deep draft vessels, tidally influenced waters, or waters of the contiguous zone, the exclusive economic zone, and the outer continental shelf." *Id.* § 300.600(b)(1).

40.    Moreover, the Secretary of the Interior is the trustee of "migratory birds; anadromous fish; endangered species and marine mammals;" certain "federally managed water systems" and "supporting ecosystems" in New Jersey. *Id.* § 300.600(b)(2).

18

41.    For natural resources located "on, over, or under land administered by the United States," the secretary of the federal agency that manages that land (*e.g.*, Department of Agriculture, Department of Defense) is the natural resource trustee. *Id.* § 300.600(b)(3).

42.    And for all other "natural resources located in the United States"— broadly including "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by . . . the United States" (*id.* § 300.600(a))—the federal natural resource trustee is the head of the "federal agency or agencies" authorized to manage or control those natural resources (*id.* § 300.600(b)(4)).

43.    Because the State seeks "all damages" for "all natural resources throughout New Jersey that contain detectable levels of Defendants' 1,4-dioxane" (*see, e.g.*, Zogby Cert., Ex. A, Compl., ¶ 113.A), its claims (except its NJCFA claim) seek to recover damages for which both New Jersey and the federal government have trusteeship interests. To succeed in proving its claims, the State necessarily must establish how much of each natural resource it holds in trust versus how much the federal trustees hold in trust, as the State logically cannot recover any natural resource damages above and beyond the extent of its trusteeship interest in a particular natural resource.

44.    The extent to which multiple federal agencies hold a trusteeship interest in the natural resources placed at issue in the Complaint is a federal issue under CERCLA and the NCP. The issue is "necessarily raised" because "vindication" of the State's rights to recover any natural resource damages "turn[s] on" the State proving the extent of its trusteeship interest for each allegedly damaged natural resource. *Ortiz*, 2009 WL 737046, at *3, 8. Only by proving the extent of the State's trusteeship interest—and, by corollary, indirectly proving the federal government's collective trusteeship interest—can the State prove that any natural resource damages the State might be owed fairly compensate the State for the damages it (and not the federal government) may have suffered. Indeed, without such a showing, there is a risk of improper double recovery. This issue is "actually disputed" and "substantial" because, if the State cannot prove the extent of its trusteeship interest, the State cannot prove its right to recover natural resource damages. *See City of Hoboken*, 45 F.4th at 709.

45.    This Court can resolve the question of the State's versus the federal trustees' interests in the natural resources at issue in the Complaint without disrupting the "federal-state balance approved by Congress." *Inselberg*, 661 F. App'x at 779. In fact, Congress has determined that federal courts should adjudicate issues related to federal trustees' authority for natural resources damages in CERCLA, a statute that grants federal courts exclusive jurisdiction over all

controversies that arise under it. 42 U.S.C. § 9607(f)(1) ("In the case of an injury to, destruction of, or loss of natural resources under subparagraph (C) of subsection (a) liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State[.]"); 42 U.S.C. § 9613(b) ("[T]he United States district courts shall have exclusive original jurisdiction over all controversies arising under this [Act], without regard to the citizenship of the parties or the amount in controversy.").

46.    Accordingly, all of the State's claims, except its NJCFA claim, raise a substantial federal question, conferring jurisdiction under 28 U.S.C. § 1331. The Court can exercise supplemental jurisdiction over the State's NJCFA claim—and therefore maintain jurisdiction over the entire action—under 28 U.S.C. §§ 1367 and 1441(c). *See Boyd*, 2013 WL 1163507, at *5.

### D.    The Court Has Jurisdiction Because this Action Arises from Injuries and Relief that Implicates Multiple Federal Enclaves

47.    The Court independently has original jurisdiction over all of the State's claims, except its NJCFA claim, under 28 U.S.C. § 1331 and the federal enclave doctrine because the State's claims arise from alleged injuries on, and requested relief that necessarily implicates, federal enclaves.

48.    A "federal enclave" is "an area over which the federal government has assumed exclusive legislative jurisdiction through the application of Art. I, Section 8

of the U.S. Constitution" (*City of Hoboken v. Exxon Mobil Corp.*, 558 F. Supp. 3d 191, 209 (D.N.J. 2021), *aff'd sub nom. City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022)), which allows Congress to "exercise exclusive Legislation" over all places purchased with the consent of a state "for the Erection of Forts, Magazines, Arsenals, dock-[y]ards, and other needful Buildings" (U.S. Const., art. I, § 8, cl. 17). Where tort claims are based on "events occurring in a federal enclave," federal courts have federal question jurisdiction under 28 U.S.C. § 1331. *Exxon Mobil*, 558 F. Supp. 3d at 209. The "key factor" in deciding whether federal enclave jurisdiction exists is "the location of the injury," taking into account whether "all or most of the pertinent events" giving rise to the claims occurred within a federal enclave. *Id.* (internal quotation marks omitted).

49.    All or most of the pertinent events giving rise to the State's claims— which are predicated on allegations that (i) Dow's TCA was defectively designed (Zogby Cert., Ex. A, Compl. ¶¶ 95–113); (ii) Dow failed to warn of the dangers of TCA (*id.* ¶¶ 114–34); and (iii) as a result, natural resources throughout New Jersey have been allegedly injured and damaged by Dow's 1,4-dioxane-containing products (*id.* ¶¶ 9–10)—likely arose on at least some federal enclaves, namely federal military facilities in New Jersey.

50.    The State attempts to evade this reality (and seeks to strip Defendants of federal court jurisdiction) by pleading, in Paragraph 68, that "[f]or purposes of

th[e] Complaint, natural resources of th[e] State do not include those natural resources on or underlying federally owned property, such as military facilities." Zogby Cert., Ex. A, Compl., ¶ 68.

51.    But the Complaint is not limited expressly to injuries that occurred to the "natural resources of th[e] State." Zogby Cert., Ex. A, Compl., ¶ 68. The State unambiguously seeks to require Defendants to "pay all costs" necessary to investigate 1,4-dioxane in "various locations throughout New Jersey." *Id.* ¶ 11. The State seeks further to require Defendants to pay all costs to restore "the sites in New Jersey" with 1,4-dioxane contamination. *Id.* ¶ 12. And in the prayers for relief for all but their NJCFA claim, the State requests that the Court find Defendants liable for all costs to remediate 1,4-dioxane contamination from "all natural resources throughout New Jersey that contain detectable levels of Defendants' 1,4-dioxane"— a request that clearly is broader than requests pertaining to "the State's natural resources." *Id.* ¶¶ 113.A–B, 134.A–B, 154.A–B, 173.B, 191.A–B, 199.A–B, 218.B.[5] In other words, while the State says it disclaims federal enclaves, the remedies it demands voids the disclaimer.

---

[5] The State used expansive language when talking about this action publicly as well. *See* N.J. Dep't of Env't Prot., AG Platkin, NJDEP, and Division of Consumer Affairs Announce 1,4-Dioxane Contamination Lawsuit (Mar. 23, 2023), https://www.njoag. gov/ag-platkin-njdep-and-division-of-consumer-affairs-announce-14-dioxane-contamination-lawsuit/ (describing this action as relating to 1,4-dioxane contamination "across New Jersey").

52. Although the State never discloses the locations of any of the 700-plus sites it alleges are contaminated with 1,4-dioxane, some of these locations likely are federal enclaves. The federal government owns hundreds of thousands of acres of land in the State of New Jersey, and it operates and has operated numerous military installations there. *See* Zogby Cert., Ex. Q, Cong. Rsch. Serv., Federal Land Ownership: Overview and Data (Feb. 21, 2020) (excerpted), at 8; New Jersey Installations, Military One Source, https:// installations. militaryonesource. mil/ state/NJ/state-installations. As discussed, TCA—which the State alleges is the primary source of the alleged 1,4-dioxane contamination (Zogby Cert., Ex. A, Compl., ¶ 32)—was used widely by the military in vapor degreasing and cold cleaning military equipment on federal enclaves across the nation. *See supra* ¶¶ 6–10. EPA Superfund records reflect that TCA is a contaminant of concern at three federal enclaves in New Jersey: the Picatinny Arsenal (Rockaway Township), the Fort Dix Landfill (Pemberton Township), and the Naval Air Engineering Center (Lakehurst). *See* Zogby Cert., Ex. R, U.S. Army Corps of Engineers, Final Fifth Five-Year Review Report, Picatinny Arsenal (Sept. 2016) (excerpted), at 144–45; Zogby Cert., Ex. S, U.S. Army Corps of Engineers, Draft Fourth Five-Year Review Report, Dix Sanitary Landfill (July 2015) (excerpted), at Table 12; Zogby Cert., Ex. T, EA Eng'g, Sci., and Tech., Inc., Fourth Five-Year Review Report, Joint Base McGuire-Dix-Lakehurst (Sept. 2016) (excerpted), at 31. And 1,4-dioxane has been

detected at two enclaves already. *See* Zogby Cert., Ex. J, 1,4-Dioxane Sampling Report, Joint Base McGuire-Dix-Lakehurst, at 4–6 (describing 1,4-dioxane detections); Zogby Cert., Ex. K, 2018 Annual Monitoring Report, Picatinny Arsenal, at 16 (describing 1,4-dioxane detections).

53.    The State cannot plead that Defendants must investigate and remediate all locations in New Jersey where 1,4-dioxane was "used, handled, stored, and/or disposed" (Zogby Cert., Ex. A, Compl., ¶ 11) and further allege that, in addition to the unidentified 700-plus supposedly contaminated sites, "the State expects to uncover additional 1,4-dioxane contamination of natural resources" (*id.* ¶ 70), but then simultaneously carve out federal enclaves to avoid the Court's subject matter jurisdiction.

54.    The patent contradictions in the State's Complaint notwithstanding, the State's disclaimer of federal enclave jurisdiction is separately ineffective because its alleged injuries cannot be divided between those that arose on federal enclaves and those that did not.[6] *See Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1329 (N.D. Ala. 2010) (concluding that where plaintiff was exposed to asbestos both on and off federal enclaves, he could not "avoid the federal enclave jurisdiction simply

---

[6] Paragraph 68 is also wholly ineffective in disclaiming federal officer removal. *See In re Asbestos Prod. Liab. Litig. (No. VI)*, 770 F. Supp. 2d 736, 741 (E.D. Pa. 2011) (disclaimer ineffective in avoiding federal officer jurisdiction).

by stating . . . he is leaving out those times he was exposed while working in a federal enclave").

55.    Specifically, the State alleges that 1,4-dioxane contamination in New Jersey "rapidly migrates" from "numerous sources," and the State expects to continue to "uncover" contaminated sites in New Jersey in addition to the 700-plus sites it alleges it already has found (but does not identify). Zogby Cert., Ex. A, Compl., ¶¶ 4, 9, 70. Taking the allegations in the Complaint as true for purposes of removal only, the State thus alleges that groundwater and surface water containing 1,4-dioxane rapidly move throughout New Jersey. *Id.* ¶ 4. Therefore, based on the State's own allegations, its alleged injuries cannot be confined to only those occurring outside federal enclaves: according to the State, as groundwater and surface water move, any 1,4-dioxane within those resources also will move, including to, underneath, and through nearby federal enclaves. The State's attempted disclaimer of federal enclave jurisdiction in Paragraph 68 of the Complaint, therefore, does not—and cannot—disclaim what it hopes to disclaim. *See Corley*, 688 F. Supp. 2d at 1329.

56.    Thus, federal enclave removal is warranted for all the State's claims, except its NJCFA claim. That claim is removable as well under 28 U.S.C. §§ 1367 and 1441. *See Boyd*, 2013 WL 1163507, at *5.

## III.    THE COURT HAS JURISDICTION AND REMOVAL IS PROPER

57.    Based on the allegations set forth above and the allegations asserted in the Complaint, this Court has jurisdiction over this entire action under 28 U.S.C. §§ 1331, 1367, and 1442. Accordingly, removal is proper under 28 U.S.C. §§ 1441, 1442, and 1446.

58.    Venue is proper in this District under 28 U.S.C. §§ 1441(a), 1442(a), and 1446(a) because the State filed its Complaint in the Superior Court of New Jersey, Mercer County.

59.    Dow's receipt of the Complaint occurred on April 6, 2023, when it waived service of process in exchange for a stipulated timeframe to respond to the Complaint. This Notice of Removal is being filed within 30 days of April 6, 2023, and therefore is timely under 28 U.S.C. § 1446(b).

60.    Although consent is not required for removal of this action on federal officer grounds, all other ascertainable Defendants[7] nonetheless consent to the removal of this action. Dow attaches to this Notice, all process, pleadings, and orders served upon it in state court. Dow will serve written notice of this filing on the State

---

[7] The Complaint names multiple "ABC Corporations" as defendants "whose identities" the State could not "ascertain[] as of filing of th[e] Complaint" (Zogby Cert., Ex. A, Compl., ¶ 24), and whose consent to removal is therefore not required. *Green v. Am. Online (AOL)*, 318 F.3d 465, 470 (3d Cir. 2003) ("[T]he general rule that all defendants must join in a notice of removal may be disregarded where, as here, the non-joining defendants are unknown.").

and promptly file a copy with the clerk of the Superior Court of New Jersey, Mercer County. *See* 28 U.S.C. § 1446.

Accordingly, Dow removes to this Court the above-captioned action that the State filed in the Superior Court of New Jersey, Mercer County.

Dated: May 3, 2023                    Respectfully submitted,

                                      BARNES & THORNBURG LLP

                                      By: /s/ *Michael C. Zogby*
                                          Michael C. Zogby
                                          michael.zogby@btlaw.com
                                          Kaitlyn E. Stone
                                          kaitlyn.stone@btlaw.com
                                          1776 on the Green
                                          67 East Park Place, Suite 500
                                          Morristown, New Jersey 07960
                                          Tel.: (973) 775-6101
                                          Fax: (973) 775-6102

                                      LATHAM & WATKINS LLP
                                          Kegan A. Brown
                                          kegan.brown@lw.com
                                          1271 Avenue of the Americas
                                          New York, New York 10020
                                          Tel.: (212) 906-1200
                                          Fax: (212) 751-4864

Mary Rose Alexander
(pro hac vice to be filed)
mary.rose.alexander@lw.com
Robert C. Collins III
(pro hac vice to be filed)
robert.collins@lw.com
330 North Wabash Avenue,
Suite 2800
Chicago, Illinois 60611
Tel.: (312) 876-7700
Fax: (312) 993-9767

*Attorneys for*
*The Dow Chemical Company*