**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND; and ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS, | Civil Action No. 23-02449 (RK) (JBD) <br><br> **OPINION** |
| Plaintiffs, |  |
| v. |  |
| THE DOW CHEMICAL COMPANY, VIBRANTZ CORPORATION f/k/a FERRO CORPORATION, LEGACY VULCAN LLC f/k/a VULCAN MATERIALS COMPANY, and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS), |  |
| Defendants. |  |

**KIRSCH, District Judge**

   **THIS MATTER** comes before the Court on Plaintiffs'[1] Motion to Remand to state court under 28 U.S.C. § 1447(c). (ECF No. 72). Defendant The Dow Chemical Company ("Dow") opposed Plaintiffs' Motion, (ECF No. 73), and Defendants Legacy Vulcan, LLC f/k/a Vulcan Materials Company ("Vulcan") and Vibrantz Corporation f/k/a Ferro Corporation ("Vibrantz")

---

[1] Plaintiffs in this matter are the Attorney General of the State of New Jersey, New Jersey Department of Environmental Protection, the Commissioner of the New Jersey Department of Environmental Protection, the Administrator of the New Jersey Spill Compensation Fund, and the Acting Director of the New Jersey Division of Consumer Affairs (collectively, "Plaintiffs," the "State," or "New Jersey").

joined Dow's opposition, (ECF Nos. 79, 80). Plaintiffs replied. (ECF No. 84.) The Court has carefully considered the parties' submissions and decides the motions without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, the Court **GRANTS** Plaintiffs' Motion to Remand this case to Superior Court of New Jersey, Law Division, Mercer County.

## I.   BACKGROUND

### A.   PROCEDURAL HISTORY

Plaintiffs in this case include the Attorney General of the State of New Jersey ("Attorney General"), and the New Jersey Department of Environmental Protection ("DEP"). Under the Public Trust Doctrine, the State is the "trustee of all natural resources within its jurisdiction for the benefit of its citizens," and DEP is vested with the authority to seek compensation for injuries to New Jersey's natural resources. (Complaint, ECF No. 1-2 ¶ 16 (citing N.J.S.A. § 58:10-23.11a; N.J.S.A. § 13:1D-150(b)).) Additional plaintiffs are the Commissioner of DEP, the Administrator of the New Jersey Spill Compensation Fund, and the Acting Director of the New Jersey Division of Consumer Affairs. (*Id.* ¶¶ 18-19 (citing N.J.S.A. § 58:10-23.11j; § 52:17B-120, -124).)

On March 23, 2023, Plaintiffs sued Defendants in the Superior Court of New Jersey, Law Division, Mercer County. Plaintiffs brought claims for defective design, failure to warn, negligence, public nuisance, trespass, impairment of the public trust, and violations of the New Jersey Spill Compensation and Control Act (the "Spill Act"), N.J.S.A. § 58:10-23.11 et seq. Plaintiffs also brought claims for violations of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-2 et seq against Dow and Vulcan. (*Id.* ¶¶ 95-236). The State's Complaint focuses on industrial and other private use and disposal of 1,4-dioxane stabilized products. (*Id.*) For purposes of its Complaint, the State defines natural resources of the State as including "all land,

fish, shellfish, wildlife, biota, air, water, and other such resources owned, managed, held in trust, or otherwise controlled by the State" as well as the "waters of the State," which include "the ocean and its estuaries, all springs, streams, and bodies of surface water or groundwater, whether natural or artificial, within the boundaries of this State or subject to its jurisdiction." (*Id.* ¶¶ 66–67 (citing N.J.S.A. § 58:10-23.11b; § 58:10A-3(t)).) The State's definition of natural resources does not include "those natural resources on or underlying federally owned property, such as military facilities." (*Id.* ¶ 68.)

On May 3, 2023, Defendant Dow, with the consent of the other Defendants, removed this case from state court, raising four independent grounds for federal jurisdiction. (Notice of Removal ("NOR"), ECF No. 1.) On August 14, 2023 the Plaintiffs filed a Motion to Remand ("MTR") this action, Dow opposed (joined by the other Defendants) (ECF No. 74),[2] and Plaintiffs replied (ECF No. 84). Certain exhibits, Dow's Opposition to the MTR, and Plaintiff's unredacted reply were sealed by Magistrate Judge J. Brendan Day on February 29, 2024.[3] (ECF No. 85.)

## B.   FACTUAL ALLEGATIONS

This case is brought by the State of New Jersey concerning the ongoing impact of the synthetic industrial chemical 1,4-dioxane on New Jersey's natural resources, particularly its ground water and waterways. (Complaint, ¶¶ 1–3.) 1,4-dioxane is a "likely human carcinogen" that has been associated with liver, gall blader, and other cancers, is "known to cause liver and

---

[2] All facts in the NOR and the Opposition to Remand refer only to Defendant Dow's arguments relating to its production and distribution of 1,4-dioxane stabilized products. While the other Defendants have joined Dow's NOR and Opposition, the facts in the record are limited to Dow and the Court will refer to them as such. The other Defendants in this case have not submitted substantive briefing to the Court adding any additional or different arguments.

[3] Magistrate Judge Day granted Dow's Motion to Seal (ECF No. 75) on February 29, 2024 (ECF No. 85). Following Judge Day's order, a redacted version of Defendants' opposition was unsealed. (ECF No. 73.) The Court will treat the unredacted, sealed version of the exhibits attached to Defendants' opposition (ECF No. 83) and Plaintiffs' reply (ECF No. 84) as controlling for purposes of this opinion.

kidney damage," and is otherwise "[h]ighly toxic and extremely persistent in the environment." (*Id.* ¶¶ 5, 30.) 1,4-dioxane does not occur naturally in the environment. (*Id.* ¶ 30.) The State alleges Defendants are "designers, manufacturers, marketers, and sellers of 1,4-dioxane and certain industrial and commercial products containing 1,4-dioxane." (*Id.* ¶ 1.)

1,4-dioxane was "used primarily as a stabilizer for chlorinated solvents, particularly 1,1,1-trichloroethane ("TCA")" largely from the 1950s through the 1990s. (*Id.* ¶ 4.). TCA was "used to dissolve oil and grease from metal in industrial settings." (*Id.* ¶ 32.) Approximately 90% of manufactured 1,4-dioxane was incorporated into TCA. (*Id.*) The 1996 Montreal Protocol, an international treaty designed to protect the ozone layer, "banned TCA for its role in depleting the ozone layer." (*Id.*) Limited use of TCA continued after the Montreal Protocol was put in place, and manufacturing of 1,4-dioxane continued. (*Id.*) In the United States, 1,4-dioxane was primarily manufactured by Defendants Dow and Vibrantz. (*Id.* ¶ 31.) The technology for 1,4-dioxane stabilization of TCA was owned and licensed by Dow, and licensed by Vulcan from Dow. (*Id.* ¶ 33.)

The primary uses for 1,4-dioxane products—i.e. vapor degreasing and other forms of metal cleaning—"result[ed] in concentrated amounts of 1,4-dioxane." (*Id.* ¶ 48.) The use of degreasing equipment resulted in concentrated 1,4-dioxane because 1,4 dioxane "boils at a higher temperature than TCA" which means that during vapor degreaser operations "a relatively high proportion of 1,4-dioxane remains as a liquid." (*Id.*) Further, the process of vapor degreasing releases TCA into the atmosphere, and requires the operator continually add TCA to the tank. (*Id.*) TCA was typically stabilized by between 2.5% and 4.5% 1,4-dioxane by weight. (*Id.*) Because the 1,4-dioxane remained in the tank as a liquid while the TCA itself evaporated into the atmosphere, "the ending concentration of 1,4-dioxane was often as high as 15% to 25%." (*Id.*) The state alleges much of

the waste TCA from vapor degreasers "were often disposed of as ordinary products (*e.g.* down drains and into sanitary landfills) even though they had toxic and hazardous properties, where they then migrated into surface water and groundwater." (*Id.*) In short, the use of degreasing equipment resulted in the release of concentrated 1,4 dioxane waste into the environment. (*Id.* ¶ 47.)

Once disposed of, "1,4-[d]ioxane has characteristics that have resulted in extensive and persistent contamination of New Jersey's natural resources." (*Id.* ¶ 34.) 1,4-dioxane is (1) mobile, and readily transported through soil into water; (2) miscible—i.e. it is totally water soluble and can travel long distances once it accesses a body of water; and (3) persistent, and does not readily biodegrade or chemically degrade either in the environment or in conventional water treatment systems. (*Id.*)

The State further alleges,

> once it was discharged, disposed of, or otherwise released into New Jersey's environment, 1,4-dioxane migrated through soils or other sediments into surface water and groundwater, where it now either contaminates and injures other natural resources, or persists in and continuously injures the water, resisting natural degradation and proving difficult and costly to treat or remove. 1,4-Dioxane entered the State's water and other natural resources through, among other things, leaks and spills, onsite wastewater treatment systems, landfill leachate, disposal sites, and industrial, commercial, and residential wastewater discharges.

(*Id.* ¶ 35.) The state's case focuses on 1,4 dioxane that reached groundwater from TCA-related industrial uses "primarily because degreasing operations were characterized by inefficient solvent recapture and disposal systems that did not protect against 1,4-dioxane releases." (*Id.* ¶ 49.) Users of the chlorinated solvents, including TCA, "routinely disposed of waste solvents by pouring them onto the ground or into trenches for evaporation or burning." (*Id.* ¶ 50.) Further, "leaks, spills, and typical disposal practices led to frequent and substantial releases from facilities using 1,4-dioxane

compounds." (*Id.* ¶49.)

The State alleges Defendants advised chlorinated solvent users to dispose of waste solvents "in ways that Defendants knew or should have known would inevitably result in 1,4-dioxane contamination of natural resources, including surface water and groundwater." (*Id.* ¶ 51.) Defendants developed Chemical Safety Data Sheets ("CSDS") and Material Safety Data Sheets ("MSDS") that were "intended to advise the actual handlers and users of Defendants' chemicals about hazardous ingredients in their products, as well as proper handling and disposal methods." (*Id.* ¶ 52.) The 1965 CSDS for TCA includes information about grades inhibited, or stabilized, by 1,4-dioxane. (*Id.* ¶ 53.) The CSDS stated TCA is "one of the least toxic of the chlorinated hydrocarbons" and did not provide any information related to the 1,4-dioxane or proper methods for removal or disposal. (*Id.*) In both the 1965 CSDS and subsequent MSDS and marketing literature, Dow and Vulcan advised users to use methodologies that they knew or should have known would result in 1,4-dioxane contamination of the environment, including "dispos[ing] of waste TCA by pouring it on the ground to 'evaporate[.]'" (*Id.* ¶¶ 53–54) The State alleges these "instructions resulted in significant contamination of water and other resources from metals fabrication and other industrial solvent release sites during the height of TCA use in the 1960s, 1970s, and 1980s." (*Id.* ¶ 54.) Further, the State alleges that before 1985 both Vulcan and Dow omitted 1,4-dioxane as an ingredient in its MSDS or product labels for dioxane-stabilized TCA products. (*Id.* ¶ 56.) Moreover, Dow and Vulcan's MSDS either did not warn of the risk of carcinogenic effects or explicitly denied same, even after conducting laboratory studies finding 1,4-dioxane caused cancer in laboratory animals. (*Id.* ¶ 57.)

In 2015, the Environmental Protection Agency ("EPA") began requiring national monitoring of 1,4-dioxane by public water systems serving more than 10,000 customers. (*Id.* ¶ 61.)

The EPA's subsequent studies showed the occurrence of 1,4-dioxane was "disproportionately more common in New Jersey" than nationwide. (*Id.* ¶ 62.) In New Jersey 17.2% of sampled public water systems show 1,4-dioxane, while the national sample was 6.6%. (*Id.*) When including "smaller systems," 24% of New Jersey's water systems exceeded EPA's lifetime health advisory for 1,4-dioxane, contrasted with 11.4% nationwide. (*Id.*) In addition, more than 700 "industrial facilities, landfills, and other contaminated sites throughout New Jersey have detected 1,4-dioxane contamination at levels exceeding New Jersey's groundwater quality standards." (*Id.* ¶ 10.)

## II.    <u>LEGAL STANDARD</u>

United States district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A defendant may remove to federal court a civil action originally filed in state court if the federal court may exercise original jurisdiction over the matter. 28 U.S.C. § 1441(a). After removal, a plaintiff may move to remand the case if the removal was defective, or the district court lacks subject matter jurisdiction. 28 U.S.C. § 1447(c); *Concepcion v. CFG Health Sys. LLC*, No. 13-2081, 2013 WL 5952042, at *2 (D.N.J. Nov. 6, 2013) ("For removal to be proper, 'a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.'" (quotation omitted)). Indeed, federal courts are obligated to remand a removed case "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). The party that removed the case has the burden of establishing federal jurisdiction. *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987). The removal statute is "strictly construed against removal and all doubts should be resolved in favor of remand." *Id.* (citation omitted).

III.   **DISCUSSION**

Typically, when plaintiffs "say their claims are state-law claims, we almost always credit that." *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 707 (3d Cir. 2022), *cert. denied sub nom. Chevron Corp. v. City of Hoboken, New Jersey*, 143 S. Ct. 2483 (2023). "That is because plaintiffs are the master[s] of the[ir] claim[s]. They may avoid federal jurisdiction by exclusive reliance on state law. After all, they choose to sue, so they choose why." *Id.* (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)) (internal quotation marks and citation omitted).

Here, the State brought state law claims and relied exclusively on New Jersey statutes, alleging: common law claims for defective design, failure to warn, negligence, public nuisance, trespass, impairment of the public trust, as well as violations of the Spill Act and the NJCFA. (ECF No. 1-2 ¶¶ 95–236.) In its NOR, Dow cited four bases as to why this matter should be the exception to the general rule that state law claims should remain in state court and this case should be removed to federal court. (ECF No. 1.) At its essence, Defendants contend "Dow manufactured TCA to meet military specification[s]" known as MIL-T-81533A ("MilSpec") and OT-620c ("FedSpec"), and that the United States military's supervision of the development of TCA and its ensuing purchase and use of Dow's products renders this action properly adjudicated in federal court rather than state court. (*Id.* ¶ 7.)

First, Defendants argue that the District Court has jurisdiction under the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1). (*Id.* ¶¶ 17–27). Second, Defendants argue the action was independently removable under 28 U.S.C. §§1331, 1367, and 1441 and the *Grable*[4] doctrine because the New Jersey Spill Act claim raised a substantial federal question regarding whether the State's cleanup complies with the National Oil and Hazardous Substances Pollution

---

[4] *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).

Contingency Plan ("NCP").[5] (*Id.* ¶¶ 28–34.) Third, Defendants argue the district court has jurisdiction because the State's claims raise a substantial federal question as to the extent of the federal trustees' interest in the natural resources at issue.[6] (*Id.* ¶¶ 35–46.) Lastly, Defendants argue that Plaintiffs' claims implicate conduct that occurred on federal enclaves, over which federal courts have original jurisdiction. (*Id.* ¶¶ 47–56.) Plaintiffs moved to remand this action to New Jersey Superior Court, arguing removal was improper on all four grounds. The Court will address each of Defendants' arguments in turn.

## A.   THE FEDERAL OFFICER REMOVAL STATUTE

The federal officer removal statute, 28 U.S.C. § 1442(a), is "an exception to the 'well-pleaded complaint' rule." *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006).[7] The

---

[5] Known as the National Contingency Plan, the NCP was established under CERCLA, 42 U.S.C. § 9601 *et seq.* "[T]he President shall, after notice and opportunity for public comments, revise and republish the national contingency plan for the removal of oil and hazardous substances . . . Such revision shall include a section of the plan to be known as the national hazardous substance response plan which shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants." 42 U.S.C. § 9605(a). The NCP Overview can be found at: https://www.epa.gov/emergency-response/national-oil-and-hazardous-substances-pollution-contingency-plan-ncp-overview (last visited April 16, 2022).

[6] Under CERCLA, the President must "designate in the NCP those federal officials who are to act on behalf of the public as trustees for natural resources . . . Natural resources means land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled . . . by the United States." 40 C.F.R. § 300.600(a). The Trustees "are authorized to act . . . when there is injury to, destruction of, loss of, or threat to natural resources, including their supporting ecosystems, as a result of a release of a hazardous substance or a discharge of oil." 40 C.F.R. § 300.600(b). The Trustees are designated as the Secretary of Commerce, Secretary of the Interior, Secretary for the land managing agency, and the head of other authorized agencies. *Id.* The Administrator of the Environmental Protection Agency and the Secretary of Agriculture are designated trustees in connection to injuries resulting from the Deepwater Horizon Oil Spill. *Id.*

[7] Federal question jurisdiction exists when a plaintiff asserts a claim "arising under the constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A case arises under federal law within the meaning of section 1331 when "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 690 (2006) (citation omitted); *see also Trent Realty Assoc. v. First Fed. Sav. & Loan Ass'n. of Phila.*, 657 F.2d 29, 33 (3d Cir. 1981) (citation omitted) ("The federal question must appear on the face of a well-pleaded complaint.")

"central aim" of the statute is "protecting officers of the federal government from interference by litigation in state court while those officers are trying to carry out their duties." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016). The federal officer removal statute is to be "liberally construed." *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 468 (3d Cir. 2015), *as amended* (June 16, 2015) (citing *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142 at 147 (2007)); *see also Papp*, 842 F.3d at 812 (finding the federal officer removal statute overall is to be liberally construed).

The parties agree the relevant test for removal under the federal officer removal statute is the four-part test articulated by the Third Circuit in *Papp v. Fore-Kast Sales Company. Id.* In such cases, the burden is on the defendant to prove the following four elements:

> (1) [the defendant] is a "person" within the meaning of the statute;
> (2) the [plaintiff's] claims are based upon the [defendant's] conduct
> "acting under" the United States, its agencies, or its officers; (3) the
> [plaintiff's] claims against [the defendant] are "for, or relating to"
> an act under color of federal office; and (4) [the defendant] raises a
> colorable federal defense to the [plaintiff's] claims.

(*Id.* (citing *Defender Ass'n,* 790 F.3d at 467). The parties do not dispute that Dow is a "person" within the meaning of the statute. (ECF No. 72-1 at 16; ECF No. 73 at 14 n.2.) However, the parties disagree as to the remaining three *Papp* factors, which the Court addresses in turn.

1. *"Acting Under" a Federal Officer or Agent*

Dow argues it was acting under federal officers in producing the 1,4-dioxane containing products at issue in this matter. (ECF No. 73 at 14–15.) Los Angeles County, California passed Rule 66 in 1967, phasing out the solvent trichloroethylene ("TCE"). (ECF No. 1 ¶ 7.) Dow states that it thereafter "met with the federal government to help it develop federal specifications for TCA," which would act as a replacement for TCE in vapor degreasing. (ECF No. 73 at 9.) Dow states it "expressly manufactured certain TCA products . . . to meet [FedSpec and MilSpec] by

10

inhibiting (also known as stabilizing) TCA with [1,4-dioxane]." (*Id.* at 9–10.) Further, it states that it "marketed these [1,4-]dioxane-stabilized TCA products to the federal government and others as compliant with the government's specifications, including the warnings required by the federal specifications, and sold these products to the government through the General Services Administration ("GSA") and to the Army, Air Force, and Navy and aerospace and defense contractors." (*Id.* at 10.)

The State disputes that Dow has sufficiently shown evidence of an "acting under relationship," and argues that Dow was effectively selling the Government an off-the-shelf commercial product, which does not authorize removal under the statute. (ECF No. 72-1 at 16–17 (citing *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1107 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023)).)

In *Papp*, the Third Circuit instructed that "[t]he 'acting under' requirement . . . is to be 'liberally construe[d]' to cover actions that involve 'an effort to *assist*, or to help *carry out*, the federal supervisor's duties or tasks.'" *Papp*, 842 F.3d at 812 (emphasis in original) (quoting *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012)). "When . . . 'the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete,' that contractor is 'acting under' the authority of a federal officer." *Id.* (citing *Ruppel*, 701 F.3d at 1181.) This relationship "typically involves subjection, guidance, or control." *Watson*, 551 U.S. at 151 (internal citations omitted).

While "the 'acting under' requirement is to be liberally applied in favor of removal . . . '[it] is not boundless.'" *Mohr v. Trustees of Univ. of Pennsylvania*, 93 F.4th 100, 105 (3d Cir. 2024) (citing *Maglioli v. All. HC Holdings LLC*, 16 F. 4th 393, 404 (3d Cir. 2021)). "At bottom, a private party is acting under the federal government when it is 'involve[d] [in] an effort to *assist*, or to

help *carry out*, the duties or tasks of the federal superior.'" *Id.* (citing *Watson*, 551 U.S. at 152 (2007)) (emphasis in original). The relationship required to support federal jurisdiction under the federal officer removal statute, however, "does not include simply *complying* with the law." *Watson*, 551 U.S. at 152 (emphasis in original). Rather, a defendant must show "that the allegations are directed at the relationship between the [defendant] and the [federal officer or agency]." *Papp*, 842 F.3d at 813; *see also Mohr*, 93 F.4th at 105 ("It is 'sufficient . . . that the [plaintiff's] allegations are directed at the relationship between' the federal government and the defendant.") (quoting *Defender Association*, 790 F.3d at 470). Indeed, the "archetypal case" involves allegations that are "directed at actions [Defendant] took while working under a federal contract to produce an item the government needed . . . that the government otherwise would have been forced to produce on its own." *Papp*, 842 F.3d at 813.

"The words 'acting under' describe 'the triggering relationship between a private entity and a federal officer.'" *Defender Association*, 790 F.3d at 468 (quoting *Watson*, 551 U.S. at 149); *see also Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) (finding there was a sufficient "special relationship" with the government where chemical companies "received delegated authority . . . [and] [t]hrough their contracts with the Government to produce Agent Orange, the chemical companies assisted and helped carry out the duties or tasks of officers at the Department of Defense.") (internal citations and quotation marks omitted)).

In this case, Dow has not met its burden to show it had such a "triggering relationship" with the federal government with regards to its production of 1,4-dioxane stabilized products. The record demonstrates that Dow had established and was selling dioxane-stabilized versions of its TCA on the private market prior to the promulgation of MilSpec and FedSpec. (ECF No. 84 at 10–12 (citing Zogby Cert. Exs. G, AC, U).) Indeed, Dow concedes that it "designed, patented, and

manufactured dioxane-stabilized TCA *before* the federal government issued MilSpec or FedSpec,"
(ECF No. 72-1 at 18), and there is no evidence in the record that suggests that the military required
Dow to use 1,4-dioxane in its formulation, (*id.* at 11).

Dow argues that its "manufacture of TCA prior to the promulgation of the MilSpec and
FedSpec is irrelevant." (ECF No. 73 at 19) (capitalization removed). The Court disagrees, given
that Dow made the decision to stabilize the TCA with 1,4-dioxane, the issue in this case,
independently and before the implementation of the federal regulations on which it relies. Further,
the regulations as promulgated in 1968 only required that the TCA be "inhibited," and did not
specify with what method Dow should "inhibit" or "stabilize" the TCA. (ECF No. 73 at 9–10.)

Moreover, while Dow argues its warnings were "compliant with the government's
specifications, including the warnings required by the federal specifications," Dow has not cited
any requirements that constrained its discretion to design industry warning labels or to otherwise
alert private consumers to the dangers of 1,4-dioxane. (*Id.* at 10.) This is distinct from the line of
Agent Orange cases, considered highly instructive regarding federal officer removal, where the
U.S. military controlled the method by which Dow and other chemical companies warned the
public regarding the dangers of Agent Orange. In *Watson v. Philip Morris Companies, Inc.* the
Supreme Court heavily relied on the Fifth Circuit's analysis in the Agent Orange case *Winters v.
Diamond Shamrock Chemical Company*, 149 F.3d 387 (5th Cir. 1998)[8] when articulating the
standards for removal of private contractors under § 1442(a). *Watson*, 551 U.S. 142, 153–154. In
contrast to the case at bar, in both *Winters* and its sister Second Circuit case *Isaacson v. Dow*

---

[8] In 2020, the Fifth Circuit modified the *Winters* holding in *Latiolais v. Huntington Ingalls, Inc.* due to the
statutory regime change brought by the Removal Clarification Act of 2011. 951 F.3d 286, 291 (5th Cir.
2020). Modification of the holding is constrained to the third prong, or the "nexus" prong, of the removal
analysis, and does not impact the level of relationship courts would expect to see between the parties in the
"acting under" prong as articulated by the Supreme Court in *Watson*. 551 U.S. 142, 153-154.

*Chemicals*, the federal government prescribed the warnings placed on the product. *Winters*, 149 F.3d at 399 ("Nothing but what the Government specified was allowed to be placed on the drums [of Agent Orange]. No warning was placed on the containers, and none was permitted by the contract specifications."); *see also Isaacson*, 517 F.3d. at 134.

In its opposition to the State's Motion to Remand, Dow submitted an affidavit from retired employee Karl W. Hoff. (ECF No. 73-1.) At Dow, Mr. Hoff served as the product manager for some of the products at issue in this litigation from 1966 to 1970. (*Id.* at ¶ 2.) In his affidavit, Mr. Hoff states that he "and others from Dow attended a meeting with officials from the federal government concerning TCA" and that at the time of the meeting he "understood that the government wanted to publish a new military specification for inhibited TCA to be used for vapor degreasing."[9] (*Id.* ¶¶ 3–4.) Mr. Hoff attests that Dow, and other companies, "provided the government with technical data regarding the specific gravity and boiling point of inhibited TCA, as well as data on other metrics." (*Id.* ¶ 4.)

A single consultation meeting with the government does not rise to the level of supervision and direction contemplated by the statute. In other cases where courts found chemical companies had a special relationship with the federal government, the government's oversight was significantly more specific and extensive than what Mr. Hoff loosely describes in this case. For example, as discussed above, the Fifth Circuit's description of the relationship between the federal

---

[9] Mr. Hoff's affidavit does not set forth the date of the meeting.

government and Dow in *Winters v. Diamond Shamrock Chemical Company* is instructive:

> The Government required that 'Agent Orange' be produced to its specifications set forth in the contracts and documents referenced therein. For example, the first contract specified that 'Agent Orange' consist of a 50–50% mixture by volume of the n-butyl esters of 2,4–D and 2,4,5–T with a tolerance under the contract for each ingredient of ± 1.5%. The 2,4–D was required to have an acid purity of a minimum of 98.0% by weight and to contain not more than 0.5% of 'free acid' by weight, and the 2,4,5–T was required to have an acid purity of a minimum of 99.0% by weight . . . Other specifications concerned the packaging, labeling and shipping of 'Agent Orange.' . . . The Government also inspected the labeling of the drums in which 'Agent Orange' was shipped.

*Winters*, 149 F.3d at 399.

This analysis illustrates the type and depth of relationship required to meet the threshold for removal under the federal officer removal statute. *Watson*, 551 U.S. at 153 (distinguishing the *Watson* defendants from Dow in *Winters*, who "fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war"); *see also Maglioli*, 16 F.4th at 405 (finding private nursing homes were not acting under a federal officer because, although heavily regulated, they were not assisting or carrying out the duties of a federal superior, were not government contractors, and did not have the kind of close relationship with the federal government that the Third Circuit has recognized in "nonprofit community defenders" which are delegated authority under Criminal Justice Act and 18 U.S.C. § 3599 to represent indigent federal defendants); *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 228 (4th Cir. 2022), *cert. denied,* 143 S. Ct. 1795 (2023) ("[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government.*") (quoting *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017)) (emphasis in original).

When FedSpec and MilSpec were promulgated, the only requirement related to Dow's use

of 1,4-dioxane in TCA was that the product be "inhibited," or stabilized. (ECF No. 1 ¶ 9.) The parties do not dispute there are other ways to stabilize TCA. The promulgation of MilSpec and FedSpec did not require Dow to change its use of 1,4-dioxane in the TCA products it was already producing and selling to buyers, including the federal government. Plaintiff alleges "Dow proposed to the government a new MilSpec for stabilized TCA, which was accepted with 'minor modifications.'" (ECF No. 84 at 12.) (emphasis removed). In contrast to the cases cited above, here, "[w]hat Defendants identify as 'substantial control and oversight' over their operations is no more than a set of requirements that Defendants, like all other [contractors], must comply with." *Delaware v. BP Am. Inc.*, 578 F. Supp. 3d 618, 637 (D. Del.), *aff'd sub nom. City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022); *see also Baltimore*, 31 F.4th at 228 ("Although Defendants contend that Citgo helped 'the Government to produce an item that it needs' by selling . . . fuel for resale on Navy bases . . . such logic would bring every seller of contracted goods and services within the ambit of § 1442 when the government is a customer.") (quoting *Watson*, 551 U.S. at 153).

In this case, Defendants cannot show more than what the Ninth Circuit has characterized as merely tantamount to "normal commercial or regulatory relationships that do not involve detailed supervision." *Honolulu*, 39 F.4th at 1107. As noted above, this "normal" relationship is reflected partly in the fact that Dow was selling the products in question in a substantially similar form to private actors before the promulgation of any regulatory standards by the government. (ECF No. 72-1 at 19.) Further, when complying with the regulations that were ultimately promulgated, "[d]efendants did not serve as government agents and were not subject to close direction or supervision" by the federal government. *Honolulu*, 39 F.4th at 1108; *cf. Defender Association*, 790 F.3d at 468 (citation omitted) (stating while the Supreme Court has not precisely

determined when private contractors fall under the statute, they must demonstrate that "at least . . . the relationship . . . is an unusually close one involving detailed regulation, monitoring, or supervision.")

Dow argues the government's increased purchases of 1,4-dioxane stabilized TCA following the promulgation of MilSpec and FedSpec show that Dow was operating under the authority of the government. (ECF No. 73 at 17–18.) However, Dow does not cite any legal authority for its proposition that increased purchases of a product by the federal government after a regulation is passed demonstrates the required "special relationship" with the federal government. *Cnty. of Lehigh v. Atl. Richfield Co.*, Civ. No. 18-5140, 2019 WL 2371783, at *6–7 (E.D. Pa. June 5, 2009) *aff'd sub nom. Cnty. of Montgomery v. Atl. Richfield Co.*, 795 F. App'x 111 (3d Cir. 2020); *see also Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 758 (9th Cir. 2022) *cert. denied*, 143 S. Ct. 1797 (2023) (finding defendant was not acting under federal authority where there was merely an arm's-length business relationship with the federal government). Further, "simply because a private party has a contractual relationship with the federal government does not mean that it is acting under that federal authority." *Mohr*, 93 F.4th at 106. On the whole, the record demonstrates that Dow was "not doing the government's business" but rather, "doing its own." *Mohr*, 93 F.4th at 105. As such, Dow was not "acting under" a federal officer or agent in its production and distribution of 1,4-dioxane stabilized products, or its alleged failure to warn consumers of their dangers.

### 2.    *"Relating to" a Federal Officer or Agent*

The second element of the *Papp* test requires "the alleged conduct ha[s] been undertaken 'for or relating to' a federal office. *Papp*, 842 F.3d at 813 (citing § 1442(a)(1)). This prong is often referred to as the "nexus" or "causation" requirement, which requires there be a "connection or

association between the act in question and the federal office." *Papp*, 842 F.3d at 813 (3d Cir. 2016) (citation omitted). In *Papp* the Third Circuit held that "in order to meet the 'for or relating to' requirement, 'it is sufficient for there to be a connection or association between the act in question and the federal office.'" *Id.* (quoting *Defender Association*, 790 F.3d at 471).

In *Papp*, the Third Circuit found a connection "between the acts complained of by [plaintiff] and the federal government" because the heart of the allegations against the defendant related to "failure to provide sufficient warning about the dangers" in the product, and the contract between the defendant and the federal government explicitly extended to "the content of written materials and warnings associated" with the product at issue. *Papp*, 842 F.3d at 813. Similarly, the Third Circuit found sufficient "'connection' or 'association' between the act in question and the federal office" in a case where an electric utility contractually limited the authority of the defendants in the case to distribute capital at issue in the claim. *Cessna v. Rea Energy Coop., Inc.*, 753 F. App'x 124, 1128 (3d Cir. 2018); *see also Defender Association*, 790 F.3d at 472 (finding "the acts complained of undoubtedly 'relate to' acts taken under color of federal office" because the defendants' employment with a federal office was "the very basis" of the litigation).

At the heart of the Government's lawsuit are the allegations that the Defendants knew about the negative effects of 1,4-dioxane, continued to produce and distribute products it knew would cause those negative effects, and withheld that information from private consumers. (ECF No. 1-2 ¶¶ 1–13.) Dow does not point to the contractual clarity found in *Cessna* or *Papp*. Even under the permissive *Papp* standard for showing a nexus, Defendant has not provided sufficient evidence that the government specifically directed Dow in the use of 1,4-dioxane, that it knew about the impact of the 1,4-dioxane at the relevant time period, or that the government supervised its 1,4-dioxane-related decision making throughout decades. Dow only points to one undated consultative

meeting with the federal government, and then governmental purchases of 1,4-dioxane stabilized TCA. (ECF No. 73 at 17 (citing Exs. V, W, Y, Z).) Absent a contract which circumscribed a defendant's conduct, courts have relied on explicit and extensive direction from the federal government regarding necessarily related activities. *New Jersey Dep't of Env't Prot. v. E.I. Du Pont De Nemours & Co.*, Civ. No. 19-14765, 2020 WL 2611539, at \*4 (D.N.J. May 22, 2020) (finding nexus over disposal of ammunition where parties agree defendant was acting under a federal officer or agent in producing the ammunition for wartime efforts).

Such has not been shown here. Rather, Dow made discretionary decisions regarding the production and sale of 1,4-dioxane stabilized TCA for decades following the promulgation of MilSpec and FedSpec. Dow does not sufficiently allege, and the record does not demonstrate, that it was supervised by the Government throughout this period, or that the government provided explicit and extensive direction to Dow.

Finally, to the extent that Defendants argue that use of 1,4-dioxane TCA on government property is enough to create sufficient nexus for removal, the Court is unpersuaded. (ECF No. 73 at 25–26.) In the Complaint and subsequent briefing, Plaintiffs explicitly disclaimed recovery for injuries related to federal land in New Jersey. (ECF No. 72-1 at 11, 24, 47 (citing ECF No. 1-2 ¶ 68).) Specifically, Plaintiffs excluded from this action "those natural resources on or underlying federally owned property, such as military facilities." (ECF No. 1-2 ¶ 68.) This type of disclaimer is referred to as a "claim disclaimer." *Dougherty v. A O Smith Corp.*, Civ. No. 13-1972, 2014 WL 3542243, at \*10 (D. Del. July 16, 2014), *report and recommendation adopted sub nom. Dougherty v. A.O. Smith Corp.*, Civ. No. CV 13-1972, 2014 WL 4447293 (D. Del. Sept. 8, 2014).

The Third Circuit's recent precedent in *City of Hoboken v Chevron Corporation* is controlling. 45 F.4th at 713. In *Hoboken*, the Third Circuit held that when a plaintiff disclaims

injuries done to federal land or created by "products or services that they provided to the federal government," such injuries cannot be the basis for removal under the federal officer removal statute. *Id.* The Third Circuit held "disclaimers are no ruse" and are distinct from "artful pleading disguis[ing] federal claims as state ones." *Id.*; *see also Delaware*, 578 F. Supp. 3d at 635 ("[F]ederal courts have consistently granted motions to remand based on 'claim disclaimers.'")

Defendants rely on the recent District of New Jersey case *Curiale v. A Clemente, Inc.*, Civ. No. 123-00187, 2023 WL 4362722, at *6 (D.N.J. July 5, 2023) to support rejection of Plaintiff's disclaimer on the grounds that the injuries from private and military use of the chemicals cannot be distinguished. (ECF No. 73 at 25.) In *Curiale*, the court found the plaintiff's complaint involved chemicals that the defendants "had not previously produced" until directed to by the federal government under specific military contracts "according to Governmental specifications, amounts and timelines." *Curiale*, 2023 WL 4362722 at *3. The *Curiale* court's analysis relied on the "contracts the Defendant has pointed to in support of removal." *Id.* at * 4. Further, the complaint in *Curiale* implicated "broad categories of chemicals" and alleged that the plaintiff's injuries were caused by defendants' actions relating to chemicals "including *but not limited to* the toxins described" in the complaint. *Id.* at *6 (emphasis in original). In contrast, the subject Complaint is devoid of such allegations. Accordingly, *Curiale* is distinguishable and inapposite to the case at bar, and does not "'open[] the door' to federal officer jurisdiction." (ECF No. 73 at 25 (quoting *Curiale*, 2023 WL 4362722 at *6).)

As Plaintiffs have disclaimed any damages accrued on federal properties, the Court finds that the third element of the *Papp* test has not been met, and Defendants have not shown sufficient

nexus between the allegations against Dow and its relationship with the federal government.

### 3. *Colorable Federal Defense*

The final element under the officer removal statute is whether Defendants "raise a 'colorable federal defense.'" *Papp*, 842 F.3d at 814 (citing *Defender Association*, 790 F.3d at 467). A defense is "colorable" within the meaning of § 1442 when the defendant "is able to prove at trial by a preponderance of the evidence the facts alleged in its notice of removal." *Papp*, 842 F.3d at 815. This is not a high standard, as "[a]t this stage, the Court's role is 'not to resolve whether the defendant has established the federal contractor defense or to resolve factual disputes, but only to ensure the existence of some competent evidence supporting a 'colorable' federal defense." *E.I. Du Pont De Nemours*, 2020 WL 2611539, at *5 (citing *Cuomo v. Crane Co.*, 771 Fed 113, 117 (2d Cir. 2014).) "Put differently, a party is not required to 'win his case before he can have it removed.'" *Id.* (citing *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999)). However, the defendant must establish that it "'aris[es] out of [defendant's] official duties.'" *Honolulu*, 39 F.4th at 1110 (quoting *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981)); see also *Lovell Mfg., a Div. of Patterson-Erie Corp. v. Exp.-Imp. Bank of the U.S.*, 843 F.2d 725, 734 n.13 (3d Cir. 1988) ("[T]he purpose of § 1442 removal is to protect federal officials from unfriendly state forums, to allow the official to raise defenses (such as immunity) arising out of his official duties.")

Here, Dow has asserted a government contractor defense. (ECF No. 1 ¶ 23.) Under the standard set forth in *Boyle v. United Technologies Corporation*, a federal contractor cannot be held liable for a state tort if, in the context of the work at issue, "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Papp* at 815 (citing *Boyle v. United Techs. Corp.*, 487

U.S. 500, 512 (1988)).

Here, Dow has not met its burden, even when "the facts in the removal notice" are "construe[d] . . . in the light most favorable to" the Defendants. *Papp*, 842 F.3d 805 (quoting *Defender Association*, 790 F.3d at 466). As discussed in detail above, (1) Dow has not shown it was a government contractor with regard to the development and ongoing production of 1,4-dioxane stabilized products, (2) the evidence in the record shows the federal government did not direct Dow's decision to use 1,4-Dioxane either in the original instance or in a continuing instance with sufficient specificity or precision, and (3) Dow has provided no evidence that the government directed or supervised any of its actions relating to the special dangers of 1,4-dioxane and warning the public. While "the procurement of equipment by the United States is an area of uniquely federal interest," such a showing "does not . . . end the inquiry." *Boyle v. United Techs. Corp.*, 487 U.S. at 507. Instead, it "merely establishes a necessary, not a sufficient, condition for the displacement of state law." *Id.*; *compare In re Asbestos Prod. Liab. Litig.*, Civ. No. 21-3667, 2021 WL 5860737, at *1 n.1 (E.D. Pa. Dec. 6, 2021) (finding a colorable military contractor defense where "[t]he facts alleged show that the government provided detailed and precise instructions to [defendant] for the design and maintenance of the [product] and would only have accepted the work if it complied with those specifications.")

Dow argues that the federal government did not need to specify its use of 1,4-dioxane via MilSpec and FedSpec. (ECF No. 73 at 28.) To support this proposition, Dow relies on *Carley v. Wheeled Coach*, in which the Third Circuit found "the government need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply." 991 F.2d 1117, 1125 (3d Cir. 1993) The Court finds this case distinguishable as the specifications in question in *Carley* were significantly more precise and

extensive than the case at bar, where the only requirement was that the TCA be inhibited, or stabilized. *Id.* ("Though it is necessary only that the government approve, rather than create, the specifications . . . in this case the government itself created and approved the specifications for the allegedly defective ambulance.") Further, the language in *Carley* weighs against the Defendants' argument when read as a whole. In *Carley*, the Third Circuit made clear that the *Boyle* test's principal purpose is to determine who should bear liability when the government used its discretion in the approval of a product's design: "[i]t is the exercise of discretion by the government in approving a product design . . . which determines whether the government contractor defense is appropriate." *Carley*, 991 F.2d at 1124. There is no evidence in the record that the federal government used such discretion here, especially because a markedly analogous product with the same use of 1,4-dioxane was already sold by Dow to the private market before the promulgation of any regulations by the government.

Similarly, *Ayo v. 3M* is also distinguishable. No. 18-0373, 2018 WL 4781145, at *11 (E.D.N.Y. Sept. 30, 2018). First, the chemicals at issue in this case, unlike in either *Ayo* or the Agent Orange cases such as *Winters* and *Isaacson*, were never considered "mission-critical" or "life-saving" and do not imply the same level of delegated authority by the federal government as the chemicals at issue in those cases. *Ayo*, 2018 WL 4781145, at *9; *see also Winters*, 149 F.3d 387; *Isaacson*, 517 F.3d 129. Further, the *Ayo* court found remand inappropriate given that "viewing the facts in the light most favorable to [the defendants], the Mil-Spec compels manufacturers to include [a specific compound] in their formulations, which is the alleged design defect at the heart of this case." *Ayo*, 2018 WL 4781145 at *12. However, unlike in *Ayo*, Dow was already selling a product with the same 1,4-dioxane compound at the heart of the Government's case, and has not alleged that MilSpec or FedSpec changed the product in ways relevant to the

proliferation of 1,4-dioxane in New Jersey's groundwater and natural resources. (*See* ECF No. 84 at 10–11 (citing Zogby Certification Exs. G, AC and Hoff Affidavit) ("Dow's new exhibits confirm it designed and sold dioxane-stabilized TCA to meet an *industry* need, not a government one.") (emphasis in original).)

The Court in *Ayo* reserved the question of whether a "fully developed record may reveal that the Mil-Spec left all design decisions—including the selection of [the specific chemicals at issue] —to [the defendants'] discretion, or that the government merely 'rubber stamped' [the defendants'] formulations." *Ayo*, 2018 WL 4781145 at *11. Here, there is already evidence in the record demonstrating the government effectively "rubber stamp[ed]" existing formulations, rather than designing the formulation in concert with Dow. *See Ayo*, 2018 WL 4781145 at *10 ("[W]here the government 'merely rubber stamps a design, . . . or where the [g]overnment merely orders a product from stock without a significant interest in the alleged design defect,' the government has not made a discretionary decision in need of protection, and the defense is therefore inapplicable." (citation omitted).)

The Court accepts Defendants' proposition that the record does not demonstrate that Dow had "superior knowledge of any risks potentially posed by TCA not known to the federal government." (ECF No. 73 at 29-30 (citing ECF No. 1 ¶ 26).) Like the Third Circuit in *Papp*, "[b]ecause we are bound to accept [Defendant's] assertion that the risks were not known to it" at this stage, we find for purposes of the officer removal statute that Defendant "did not have any superior knowledge that it withheld from the government." *Papp* at 814–15. However, given Dow has not met the first two prongs of the *Boyle* test, the Court still finds that Dow has not shown it has a colorable federal defense. Because of this and the Court's analysis of the prongs above, the Court finds the Defendants have not met their burden to satisfy the *Papp* test authorizing removal

under the federal officer removal statute.

**B.    FEDERAL LAW CLAIMS**

Having found that the federal officer removal statute exception does not provide a basis for removal of this case, the Court turns to Defendants second argument: removal based on the *Grable* doctrine. The *Grable* doctrine is another exception to the "well pleaded complaint" rule and was established in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005). The doctrine circumscribes that "[f]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Manning v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 772 F.3d 158, 163 (3d Cir. 2014), *aff'd*, 578 U.S. 374 (2016) (citation omitted).

The *Grable* doctrine applies to a "'special and small' category of cases." *MHA LLC v. HealthFirst, Inc.*, 629 F. App'x 409, 412 (3d Cir. 2015) (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)). "[T]he Supreme Court has distinguished cases such as *Grable* that present a 'nearly pure issue of law' that would govern numerous other cases, from those that are 'fact-bound and situation specific.'" *Id.* at 413 (quoting *Empire Healthchoice Assurance*, 547 U.S. at 700–01); *see also Par. of Plaquemines v. Chevron USA, Inc.*, 7 F.4th 362, 375 (5th Cir. 2021) ("[F]ederal question jurisdiction under *Grable* is only appropriate when a case presents a nearly pure issue of law—and not . . . where the case is fact-bound and situation-specific.") (internal citation and quotation marks omitted).

"[T]he Supreme Court has 'confined federal-question jurisdiction over state-law claims to those that really and substantially involve a dispute or controversy respecting the validity, construction or effect of federal law.'" *Cnty. of Lehigh*, 2019 WL 2371783, at *2 (quoting *Grable*,

545 U.S. at 313 (internal quotation marks and brackets omitted)). The Third Circuit has stated that "[t]he prototypical case of Grable jurisdiction is one in which the federal government itself seeks access to a federal forum, an action of the federal government must be adjudicated, or where the validity of a federal statute is in question." *MHA LLC*, 629 F. App'x at 413 n.6 (3d Cir. 2015) (citing *Gunn v. Minton*, 568 U.S. 251, 260 (2013)). Consequently, there is a high bar for cases to be removed under *Grable*. Nationally, "'[o]nly a few cases' have ever fallen into this narrow category.'" *San Mateo*, 32 F.4th at 746 (quoting *City of Oakland v. BP PLC*, 969 F.3d 895, 904 (9th Cir. 2020)). Further, other Circuits have warned that "[f]ederal courts must be 'cautious' in exercising this form of jurisdiction because it lies at the 'outer reaches of § 1331.' . . . the Supreme Court has emphasized that the 'mere presence of a federal issue in a state cause of action *does not automatically* confer federal-question jurisdiction.'" *Baltimore*, 31 F.4th at 208–09 (quoting *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 810 (1986)) (emphasis in original).

Dow asserts two separate bases for application of the *Grable* doctrine. The Court does not find either basis persuasive here and does not find Defendants sufficiently raise federal questions requiring removal of this action.

*1.   The New Jersey Spill Act*

First, the Court finds no merit in Dow's argument that the Spill Act's reference to and reliance on the NCP standards require claims brought under it to be removed to federal court. (ECF No.73 at 31.) The Spill Act's cabined language that state cleanup "shall, to the greatest extent possible, be in accordance with the [NCP] for cleanup and removal of oil and hazardous substances established pursuant to [the federal Clean Water Act]," N.J.S.A. 58:10-12.11f(a)(3), does not raise a substantial issue as to the validity, construction, or effect of federal law.

Further, Defendant's argument does not meet any of the standards required for removal

*Grable*. First, this issue is clearly not "necessarily raised" by invocation of the Spill Act, as there are hundreds of Spill Act cases that have been adjudicated in New Jersey state courts, and Defendant has not argued this case raises special or specific issues under this provision.[10] "[A] federal issue is 'necessarily raised' only when a federal question is a 'necessary element' of one of the pleaded state-law claims within a plaintiff's complaint." *Baltimore*, 31 F.4th at 209 (quotation omitted); *see also Inselberg v. New York Football Giants, Inc.*, 661 F. App'x 776, 778 (3d Cir. 2016) (where the District Court remanded to state court because the claims at issue were state court claims on their face rather than federal claims). *Cf. Gunn*, 568 U.S. at 259 ("[W]e acknowledge that resolution of a federal [] question is 'necessary' to [Defendant's] case . . . [t]o prevail on his [state] claim . . . [Defendant] must show that he would have prevailed in his federal . . . case"). The Court finds that Plaintiffs' Spill Act Claim does not require a preliminary adjudication of any federal law claim.

Second, the federal considerations raised by the Statute's reference to the standards set by the NCP for cleanup are not "actually disputed" in the case under the meaning of *Grable. See Gunn*, 568 U.S. at 259 (finding an issue is "actually disputed" when "on the merits, it is the central point of dispute."); *City of Hoboken*, 45 F.4th at 709 (examining "the two key cases [*Grable* and *Gunn*] defining what federal questions are substantial and disputed" and finding "[i]n each, to prove some element of a state-law claim, the plaintiff had to win on an issue of federal law.") (emphasis removed). The requirement that cleanup comply with NCP standards is not central to the dispute at hand. *See Devine v. Novartis Pharms. Corp.*, Civ. No. 08-859, 2009 WL 3446404,

---

[10] The Court could not find, and the Defendant did not cite, any cases among the close to four hundred available Spill Act cases that suggests such cases must be adjudicated in federal court under the *Grable* doctrine. The Court also did not find any reference that suggests the New Jersey legislature intended for all Spill Act cases to be adjudicated in federal courts as suggested by the Defendant.

at *4 (D.N.J. Oct. 19, 2009) (denying removal under the first prong of *Grable* where the federal element did not appear to require a sophisticated understanding of the relevant federal agency's rules and regulations); *Sullivan v. Novartis Pharms. Corp.*, 602 F. Supp. 2d 527, 533 (D.N.J. 2009) (collecting cases "uniformly reject[ing]" application of the *Grable* exception where a state statute included language that a violation of federal agency regulations could lead to an award of punitive damages).

Third, the NCP standards and any resulting dispute regarding the State's duty to comply with these standards are not "substantial" under *Grable*. Defendant's argument that allowing this question to remain in state court could "undermine the development of a uniform body of [federal] law" is unavailing and not supported by caselaw. (ECF No. 73 at 37 (citing *Gunn*, 568 U.S. at 261).)

This is not the type of claim raising an issue of interpretation of federal law requiring a federal forum. *Empire Healthchoice Assurance,* 547 U.S. at 700 ("The meaning of the federal tax provision . . . is an important issue of federal law that sensibly belongs in a federal court.") Accepting Dow's position *arguendo*, here, would render such claims "not the type of claim for which federal-question jurisdiction lies" as it would "require a fact-intensive and situation-specific analysis" in order to evaluate compliance with the NCP standard. *San Mateo*, 32 F.4th at 748 (citing *Oakland*, 969 F.3d at 907); *see also MHA LLC*, 629 F. App'x at 413 ("[T]he Supreme Court has distinguished cases such as *Grable* that present a nearly pure issue of law that would govern numerous other cases, from those that are fact-bound and situation-specific.") (internal quotation marks and citations omitted).

Finally, requiring removal of this case under *Grable* would disturb the federal-state balance prescribed by Congress. *See Grable*, 545 U.S. at 314 ("[T]he federal issue will ultimately qualify

28

for a federal forum only if federal jurisdiction is consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331."); *Devine*, 2009 WL 3446404, at *7 ("Plaintiff's claims sound in state law . . . State courts have a strong interest in handling cases where state law predominates.")

Defendants' suggested application of the statute would render not only all Spill Act cases generally removable but could implicate other claims brought under state laws that merely mention compliance with a federal standard. For example, there have been hundreds of cases litigated under the Spill Act in New Jersey courts. *See, e.g.*, *New Jersey Dep't of Env't Prot. v. Dimant*, 212 N.J. 153, 178 (2012) (relying on legislative history, among other factors, in analyzing the differences in the Spill Act and CERCLA's standards for liability and causation); *New Jersey Dep't of Env't Prot. v. Occidental Chem. Corp.*, Civ. No. A-2036-17, 2021 WL 6109820, at *5 (N.J. Super. Ct. App. Div. Dec. 27, 2021) (applying CERCLA legislative history to the Appellate Division's analysis of equitable allocation of Spill Act contribution costs); *Matter of Spill Fund Lien*, Civ. No. A-2665-15T1, 2019 WL 3798837, at *5 (N.J. Super. Ct. App. Div. Aug. 13, 2019) (analyzing the similarities of liens arising out of the Spill Act and CERCLA and affirming the Spill Act lien); *Cf. Keegan v. Town of Kearny*, Civ. No. A-0309-19, 2021 WL 2525892, at *8 (N.J. Super. Ct. App. Div. June 21, 2021) (affirming the trial court's application of CERCLA standards for cleanup cost allocation under the Sanitary Landfill Facility Closure and Contingency Fund Act, ("Closing Act"), N.J.S.A. 13:1E-110 to -230, and rejecting application of the Spill Act's liability standards to the Closing Act). To apply Dow's broad reading would be to upend the Third Circuit's clear mandate that the *Grable* doctrine applies in only the rare and discrete case—which the case at bar is not. *MHA LLC*, 629 F. App'x at 412. The Court will not

do so.

### 2. *Extent of Federal Trusteeship*

Dow also argues that the *Grable* doctrine applies in this case because the Court must determine the federal trustees' interest in the natural resources at issue. (ECF No. 73 at 42.) "A 'trustee' is a federal, state or Indian tribal official who, in accordance with 42 U.S.C. § 9607(f)(2), is designated to 'act on behalf of the public as [a] trustee[ ] for natural resources.'" *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*, 134 F.3d 1095, 1098 n.1 (D.C. Cir. 1998). In New Jersey, "the State's Commissioner of Environmental Protection serves as the Trustee of all natural resources of the state." (Zogby Dec., Ex. P, ECF No. 1-17 at 2.) Because "certain natural resources are also held in trust by the federal government for the benefit of all people of the United States . . . the Commissioner may serve as a co-trustee together with federal trustees." (*Id.*) These trustees may include the U.S. Department of the Interior, the National Oceanic and Atmospheric Administration, or the U.S. Department of Defense. (*Id.*) Defendants argue that "[b]ecause the State seeks 'all damages' for 'all natural resources throughout New Jersey that contain detectable levels of Defendants' 1,4-dioxane'" Plaintiffs necessarily "seek to recover damages for which both New Jersey and the federal government have trusteeship interests." (ECF No. 1 ¶ 43.) Dow argues applying the *Grable* doctrine to the issue of co-trusteeship would not disturb any state-federal balance, and that the question is necessarily raised, is actually disputed and is a substantial issue in the case. (ECF No. 73 at 42.)

The Court disagrees. All states necessarily have some co-trusteeship of natural resources with the federal government, as categories of federal trusteeship include, for example: waters navigable by deep draft vessels; tidal waters; migratory birds; endangered species; and federally managed water systems. 40 C.F.R. § 300.600(b). As Plaintiffs argue, CERCLA itself contemplates

there may be multiple trustees with concurrent jurisdictions, and directs them to coordinate. 40 C.F.R. §300.615(a) ("Where there are multiple trustees, because of coexisting or contiguous natural resources or concurrent jurisdictions, they should coordinate and cooperate in carrying out these responsibilities."); *see also Coeur D'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094, 1115 (D. Idaho 2003), *modified in part sub nom. United States v. Asarco Inc.*, 471 F. Supp. 2d 1063 (D. Idaho 2005) ("[I]n many instances, co-trustees are the norm and not the exception.")

Finding that such co-trusteeship requires environmental cases be adjudicated in federal courts would significantly disturb the federal-state law balance as anticipated in *Grable*. States routinely bring environmental actions in state courts under state laws. *See Atlantic Richfield Company v. Christian,* 140 S. Ct. 1335, 1349 (2020) (affirming that CERCLA, 42 U.S.C. § 9601, "does not strip [State] courts of jurisdiction . . . over claims brought under other sources of law.") Plaintiffs have aptly couched Dow's argument as a "thinly veiled preemption defense that would sweep most, if not all, state environmental enforcement actions into federal court." (ECF No. 84 at 24.) Failure under *Grable*'s fourth prong, or as Justice Souter termed "the veto," would be enough here to find that this case should not be removed. *Grable*, 545 U.S. at 313–314. ("Because arising-under jurisdiction to hear a state-law claim always raises the possibility of upsetting the state-federal line drawn (or at least assumed) by Congress, the presence of a disputed federal issue and the ostensible importance of a federal forum are never necessarily dispositive; there must always be an assessment of any disruptive portent in exercising federal jurisdiction.")

Moreover, Dow fails to show the trusteeship issue is either necessarily raised, or actually in dispute. In *Atlantic Richfield*, the Supreme Court "recognized a 'deeply rooted presumption in favor of concurrent state court jurisdiction' over federal claims." 140 S. Ct. at 1351 (quoting *Tafflin v. Levitt*, 493 U.S. 455, 458–59 (1990)). Writing for the Court, Chief Justice Roberts wrote, "[o]nly

an 'explicit statutory directive,' an 'unmistakable implication from legislative history,' or 'a clear incompatibility between state-court jurisdiction and federal interests' can displace this presumption.'" *Id.* Here, Dow has alleged no statutory directive mandating otherwise, judicial history implication, or clear incompatibility between states and federal interests that would motivate against the presumption of concurrent jurisdiction. *Id.*

Here, the federal trustees have not opposed the instant action. (ECF No. 72-1 at 44.) Further, given the Supreme Court's imprimatur that state courts may bring their own state common law claims related to CERCLA cleanups, Defendants cannot argue that Plaintiff must "win on an issue of federal law" to "prove some element of [its] state law claim." *City of Hoboken*, 45 F.4th at 709. Dow's argument that "Congress already has determined that where . . . there is co-trusteeship of State and federal trustees, federal courts should adjudicate those interests" is unavailing in light of *Atlantic Richfield's* holding that CERCLA does not strip state courts of jurisdiction over claim under other sources of law. (ECF No. 73 at 45–46.)

The Court could not find, and Defendants did not cite, a case where the co-trusteeship of natural resources was relied on to support removal of state environmental actions to federal court. To the contrary, courts routinely deny the application of *Grable* to natural resources cases and remand to state court. *See Delaware*, 578 F. Supp. 3d at 632 ("On the defendants' theory, many (if not all) state tort claims that involve the balancing of interests and are brought against federally regulated entities would be removable. *Grable* does not sweep so broadly.") (citations omitted); *see also Baltimore*, 31 F.4th at 209 (finding a federal question was not necessarily raised in an environmental action and that defendant failed the *Grable* test); *Parish of Plaquemines*, 7 F.4th at 374 (finding no federal laws or regulations that were "actually disputed" and that removal was not

warranted under *Grable*).

Finally, an inquiry into the issue of co-trusteeship is necessarily fact-intensive and situation specific—the type of inquiry that motivates against removal under the substantiality prong of the *Grable* analysis. *MHA LLC*, 629 F. App'x 409, 413 (3d Cir. 2015) (differentiating cases of pure law from those that are fact bound and specific for *Grable* purposes); *see, e.g., Coeur D'Alene Tribe*, 280 F. Supp. 2d at 1115 ("The factual predicate of trusteeship . . . is to be determined on a case by case basis depending on who the resource belongs to, who is it managed by, who controls the same and how the resource appertains to other resources.")

Accordingly, the Court finds that Dow has not met its burden of showing *Grable* removal is warranted in this case.

## C.    FEDERAL ENCLAVE JURISDICTION

Finally, Dow argues this action should be removed under the federal enclave doctrine because "[a]ll or most of the pertinent events giving rise to the State's claims . . . likely arose on at least some federal enclaves, namely federal military facilities in New Jersey." (ECF No. 1 ¶¶ 48–49 (citing U.S. Const., art. 1, § 8 cl.17).) The parties agree the "key factor" in such analysis is the "location of the injury." (ECF No. 1 ¶ 48; ECF No. 72-1 at 46–47.) As discussed above, Plaintiffs explicitly disclaimed recovery for i68njuries related to federal enclaves in New Jersey. (ECF No. 72-1 at 11, 24, 47 (citing ECF No. 1-2 ¶ 68).) Specifically, Plaintiffs excluded from their claim "those natural resources on or underlying federally owned property, such as military facilities." (ECF No. 1-2 ¶ 68.) Defendants argue such a disclaimer is unavailing. (ECF No. 73 at 47.)

Appellate Courts in other circuits have found similar claim disclaimers valid in cases where Defendants plead enclave jurisdiction. *See Baltimore*, 31 F.4th at 219. ("[G]iven Baltimore's alleged injuries have not occurred on a federal enclave, [Plaintiff] seeks relief for harms sustained

on non-federal land, which precludes the exercise of federal-question jurisdiction."); *Bd. of Cnty. Commissioners of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1271 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023) ("The district court held federal enclave jurisdiction does not support removal because although injury may have occurred to those federal enclaves, [t]he actual injury for which [the municipalities] seek compensation is injury to their property and their residents, occurring within their respective jurisdictions and not within the federal enclaves. We agree.") (internal quotation marks omitted).

The Third Circuit has not contemplated the exact issue of whether a plaintiff's claim disclaimer is sufficient to prevent removal based on federal enclave jurisdiction. *Dougherty*, 2014 WL 3542243 at * 10 ("While courts in this Circuit have not previously addressed express claim disclaimers . . . federal courts have consistently granted motions to remand where the plaintiff expressly disclaimed the claims upon which federal officer removal was based."). Recently, however, in *City of Hoboken v. Chevron Corporation*, the Third Circuit has applied similar reasoning to find plaintiffs could disclaim injuries committed on federal land when analyzing the appropriateness of removal under the federal officer removal statute. *Hoboken*, 45 F.4th at 713. As discussed in the federal officer removal section above, in *Hoboken*, the Third Circuit found that "disclaimers are no ruse" and that they are distinct from "artful pleading disguis[ing] federal claims as state ones." *Id.* There, the Third Circuit affirmed two district court orders remanding cases to state court, finding "the causes of action are about state torts." *Id.* The Court wrote that instead of masking federal claims as state ones, by disclaiming any federally affiliated injuries, Plaintiffs "carve out a small island that would needlessly complicate their cases." *Id.* The Court made clear it would "not hang [its] jurisdiction on so small a slice of the pie." *Id.*

34

Here, Plaintiffs carve out recovery from any injuries caused by 1,4-dioxane that "flowed onto or under federal enclave land." (ECF No. 72-1 at 49.) Throughout its briefing, Dow largely disregards that New Jersey's Complaint focuses on the environmental impact of private sales to consumers, and subsequent lack of warning regarding the dangers of 1,4-dioxane—not Dow's sales to the United States military.

The Ninth Circuit, which has explicitly contemplated federal enclave jurisdiction in the context of environmental cases, has denied removal based on enclave jurisdiction in similar circumstances to those in this action. *Honolulu*, 39 F.4th at 1111 (collecting federal enclave jurisdiction cases and invoking the federal enclave jurisdiction narrowly). As in the underlying district court case in *Honolulu*, in this case, "contrary to [the defendants'] assertions, the relevant conduct here, let alone 'all' of it, is not" the military's use of 1,4-dioxane stabilized products or its original manufacture. *City & Cnty. of Honolulu v. Sunoco LP*, Civ. No. 20- 00163, 2021 WL 531237, at *8 (D. Haw. Feb. 12, 2021), *aff'd*, 39 F.4th 1101 (9th Cir. 2022). "It is, instead, the warning and disseminating of information about the hazards" of the 1,4-dioxane, and the continued production and sale of such chemicals to industry and private purchasers for decades after defendants knew of the dangers. *Id.*

The Court agrees that here, like the Ninth Circuit upheld in *Honolulu*, "[i]t would require the most tortured reading" of the Complaint to find that federal enclave jurisdiction applies. *Honolulu*, 39 F.4th at 1111 (quoting *Honolulu*, 2021 WL 531237 at *8).) The Court will not, as the Third Circuit did not in *Hoboken*, "hang our jurisdiction on so small a slice of the pie." 45 F.4th at 713. Dow has not demonstrated that it even had a contract with the federal government for the 1,4-dioxane stabilized products, let alone that the alleged injuries to New Jersey's natural

resources arose largely from military enclaves rather than the extensive private sales to industry set forth in the exhibits it has submitted to the Court.

Dow argues that the "State's disclaimer of federal enclave jurisdiction is ineffective because its alleged injuries cannot be divided between those that arose on federal enclaves and those that did not." (ECF No. 1 ¶ 54.) Dow argues that because 1,4-dioxane spreads through ground water, any damage that could have arisen from federal enclaves "cannot be confined to only those occurring outside federal enclaves: according to the State, as groundwater and surface water move, any 1,4-dioxane within those resources also will move, including to, underneath, and through nearby federal enclaves." (ECF No. 1 ¶ 55.)

The Court finds this interpretation impermissibly expansive, riddled with conjecture and extrapolation, and a far broader reading than other courts have found appropriate. The Third Circuit in *Hoboken* rejected a similar argument in its analysis of removal under the federal officer statute. 45 F.4th 699 at 713 (rejecting the argument brought by defendants that removal was appropriate because "these suits cannot separate harm caused by military fuel use from harm caused by civilian fuel use.") In another Ninth Circuit case on federal enclave jurisdiction, *County of San Mateo v. Chevron Corporation*, the panel rejected a substantially similar argument, finding plaintiffs "have not alleged that their claims are based on torts taking place on a federal enclave . . . [r]ather, their complaint raises state-law claims arising from injuries to real property and infrastructure within their local jurisdictions." 32 F.4th 733, 749–50.

Here, "[t]he connection between conduct on federal enclaves and the . . . alleged injuries is too attenuated and remote to establish that the . . . cause of action is governed by the federal law applicable to any federal enclave." *San Mateo*, 32 F.4th at 750. The Court finds Plaintiffs'

disclaimer of injury resulting from federal enclaves to be availing in this case, and that removal is not appropriate based on federal enclave jurisdiction.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to remand is **GRANTED**, and this matter is **REMANDED** to the Superior Court of New Jersey, Law Division, Mercer County. An appropriate Order accompanies this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: April 23, 2024