NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ATTORNEY GENERAL OF THE STATE OF NEW JERSEY; NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION; THE ADMINISTRATOR OF THE NEW JERSEY SPILL COMPENSATION FUND; and ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS, | Civil Action No. 23-2449 (RK) (JBD) <br><br> **MEMORANDUM OPINION** |
| Plaintiffs, | |
| v. | |
| THE DOW CHEMICAL COMPANY, VIBRANTZ CORPORATION f/k/a FERRO CORPORATION, LEGACY VULCAN LLC f/k/a VULCAN MATERIALS COMPANY, and "ABC CORPORATIONS" 1-10 (NAMES FICTITIOUS), | |
| Defendants. | |

**KIRSCH, District Judge**

THIS MATTER comes before the Court upon a Motion to Stay Execution of Remand Order Pending Appeal, ("MTS," ECF No. 93), filed by Defendants The Dow Chemical Company ("Dow"), Vibrantz Corporation f/k/a Ferro Corporation, and Legacy Vulcan, LLC f/k/a Vulcan Materials Company (collectively, "Defendants"). The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion to Stay is **DENIED**.

## I.      **BACKGROUND**

Plaintiffs initiated this action on March 23, 2023 in the Superior Court of New Jersey, Law Division, Mercer County.[1] The Complaint focuses on the impact of the hazardous synthetic industrial chemical 1,4-dioxane on New Jersey's natural resources, particularly its ground water and waterways. ("Compl.," ECF No. 1-2, ¶¶ 1–3.) Defendants are all "designers, manufacturers, marketers, and sellers of 1,4-dioxane and certain industrial and commercial products containing 1,4-dioxane." (*Id.* ¶ 1.) 1,4-dioxane was "used primarily as a stabilizer for chlorinated solvents, particularly 1,1,1-trichloroethane ("TCA")" largely from the 1950s through the 1990s. (*Id.* ¶ 4.) TCA was used to dissolve oil and grease from metal. (*Id.* ¶ 32.)

Against all Defendants, Plaintiffs brought claims for defective design, failure to warn, negligence, public nuisance, trespass, impairment of the public trust, and violations of the New Jersey Spill Compensation and Control Act (the "Spill Act"), N.J.S.A. § 58:10-23.11 *et seq.* As to Defendants Dow and Vulcan, Plaintiffs also brought claims for violations of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-2 *et seq.* (*Id.* ¶¶ 95–236.)

On May 3, 2023, Dow, with the consent of the other Defendants, removed this case to federal court. (Notice of Removal ("NOR"), ECF No. 1.) Although each of Plaintiffs' claims are brought under state law, Defendants argued that there are four bases upon which this matter poses an exception to the general rule that state law claims should remain in state court. (*Id.*) First, Defendants argued that the district court has jurisdiction under the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1). (*Id.* ¶¶ 17–27). Second, Defendants argued this action is removable under 28 U.S.C. §§ 1331, 1367, and 1441 and the *Grable* doctrine because Plaintiffs'

---

[1] Plaintiffs in this matter are the Attorney General of the State of New Jersey, New Jersey Department of Environmental Protection, the Commissioner of the New Jersey Department of Environmental Protection, the Administrator of the New Jersey Spill Compensation Fund, and the Acting Director of the New Jersey Division of Consumer Affairs (collectively, "Plaintiffs," the "State," or "New Jersey").

New Jersey Spill Act claim raises a substantial federal question regarding whether the State's cleanup complies with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP").[2] (*Id.* ¶¶ 28–34); *see also Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005). Third, Defendants argued the district court has jurisdiction because the State's claims raise a substantial federal question as to the extent of the federal trustees' interest in the natural resources at issue.[3] (*Id.* ¶¶ 35–46.) Fourth, Defendants argued that Plaintiffs' claims implicate conduct that occurred on federal enclaves, over which federal courts have original jurisdiction. (*Id.* ¶¶ 47–56.) The gravamen of Defendants' argument is that Dow manufactured TCA to meet military specifications known as MIL-T-81533A ("MilSpec") and OT-620c ("FedSpec"), and that the United States military's supervision of the development of TCA and its ensuing purchase and use of Dow's products renders this action properly adjudicated in federal court rather than state court. (NOR ¶ 7.)

On August 14, 2023, Plaintiffs filed a Motion to Remand. ("MTR," ECF No. 72.) The Court granted Plaintiffs' Motion on April 23, 2024 and ordered that this case be remanded to the Superior Court of New Jersey, Law Division, Mercer County. ("Remand Opinion," ECF No. 86;

---

[2] Known as the National Contingency Plan, the NCP was established under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*: "[T]he President shall, after notice and opportunity for public comments, revise and republish the national contingency plan for the removal of oil and hazardous substances . . . Such revision shall include a section of the plan to be known as the national hazardous substance response plan which shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants." 42 U.S.C. § 9605(a). The NCP Overview can be found at: https://www.epa.gov/emergency-response/national-oil-and-hazardous-substances-pollution-contingency-plan-ncp-overview (last visited April 16, 2022).

[3] Under CERCLA, the President must "designate in the NCP those federal officials who are to act on behalf of the public as trustees for natural resources . . . Natural resources means land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled . . . by the United States." 40 C.F.R. § 300.600(a). The Trustees "are authorized to act . . . when there is injury to, destruction of, loss of, or threat to natural resources, including their supporting ecosystems, as a result of a release of a hazardous substance or a discharge of oil." 40 C.F.R. § 300.600(b).

ECF No. 87.) That same day, Defendant Dow requested an automatic stay of the remand order and appealed the remand to the Third Circuit Court of Appeals. (*See* ECF Nos. 89, 90.) On April 25, the Court granted the automatic stay, (ECF No. 92), and the next day, Defendants filed the instant Motion to Stay Execution of Remand Order Pending Appeal, ("MTS," ECF No. 93.) Plaintiffs filed a Brief in Opposition, ("Opp. to MTS," ECF No. 98), and Defendants filed a Reply, ("Reply," ECF No. 99).

## II.   **LEGAL STANDARD**

"A stay is an intrusion into the ordinary processes of administration and judicial review . . . and accordingly is not a matter of right . . . ." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (cleaned up); *id.* at 437 (Kennedy, J. concurring ("A stay of removal is an extraordinary remedy that should not be granted in the ordinary case, much less awarded as of right.")); *Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, 830 F. App'x 377, 389 (3d Cir. 2020) ("Injunctions pending appeal, like preliminary injunctions, are extraordinary remed[ies] never awarded as of right." (quotations and citation omitted)).

In determining whether a stay should issue pending appeal, courts consider four factors: "(1) whether the appellant has made a strong showing of the likelihood of success on the merits; (2) will the appellant suffer irreparable injury absent a stay; (3) would a stay substantially harm other parties with an interest in the litigation; and (4) whether a stay is in the public interest." *Id.* at 434; *see also In re Revel AC, Inc.*, 802 F.3d 558, 565 (3d Cir. 2015) (same). The movant bears the burden of demonstrating the first two factors, which are the "most critical." *Reilly v. Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Once the movant demonstrates these first two factors, a court must "weigh the likely harm to the movant (absent a stay) (factor two) against the likely irreparable harm to the stay opponent(s) if the stay is granted (factor three)"—this is referred

to as the "balancing of harms." *In re Revel AC, Inc.*, 802 F.3d at 569 (cleaned up). Finally, a court must take into account where the public interest lies. *Id.*

The Third Circuit has adopted a "sliding scale" approach to balancing these four factors. *Id.* Under this approach, the more likely the plaintiff is to prevail, the less heavily the balance of harms needs to weigh in its favor; the less likely, concomitantly, the more heavily the balance of harms needs to weigh in plaintiff's favor. *Id.* However, "[k]eeping in mind that the first two factors are the most critical, if 'the chance of success on the merits [is only] better than negligible' and the 'possibility of irreparable injury' is low, a stay movant's request fails." *Id.* at 570 (quoting *Nken*, 556 U.S. at 434). As the Third Circuit has explained:

> To sum up, all four stay factors are interconnected, and thus the analysis should proceed as follows. Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) and (b) will suffer irreparable harm absent a stay? If it has, we balance the relative harms considering all four factors using a sliding scale approach. However, if the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.

*Id.* at 571 (cleaned up.)

## III.  DISCUSSION

As an initial matter, the Court notes that it is unclear whether the Court retains jurisdiction over this action. While Dow requested an automatic stay of this Court's Remand Order on April 23, 2024, the Clerk of Court mailed the transmittal letter that same day, which the docket reflects was mailed *before* Dow's request was docketed. (*Compare* ECF No. 88 *with* ECF No. 89.) The transmittal letter enclosed "a certified copy of the Order remanding the above entitled matter" to the Superior Court. (ECF No. 88.) The Third Circuit has held that the "jurisdictional event" which divests a district court of jurisdiction is when "the certified copy of the remand order [is sent] to

state court." *Agostini v. Piper Aircraft Corp.*, 729 F.3d 350, 356 (3d Cir. 2013) ("At the moment of mailing—the jurisdictional event—the remand order became unreviewable 'on appeal or otherwise.'"). Thus, presuming the transmittal letter was mailed before Defendant's stay request was received, the Court no longer retains jurisdiction over this matter. Nonetheless, in an abundance of caution, the Court will consider Defendants' arguments for a stay pending appeal.

### A.   LIKELIHOOD OF SUCCESS ON THE MERITS

As noted above, the first factor is a strong showing of likelihood of success on the merits. In the Third Circuit, a "strong showing" exists when there is a "a reasonable chance, or probability, of winning." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). While it "is not enough that the chance of success on the merits be better than negligible," *Nken*, 556 U.S. at 434 (quotations and citation omitted), the likelihood of winning on appeal need not be "more likely than not," *Singer Mgmt. Consultants*, 650 F.3d at 229. The Third Circuit has explained that this first factor is "arguably the more important piece of the stay analysis" as compared to the harm factors. *In re Revel AC, Inc.*, 802 F.3d at 568. Indeed, the Supreme Court has stated that "a stay is not a matter of right *even if* irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (emphasis added). The Court finds that Defendants have failed to make the requisite "strong showing" that they are likely to succeed on the merits.

#### 1.   FEDERAL OFFICER JURISDICTION

In opposition to Plaintiff's Motion to Remand, Dow argued that it was "acting under" federal officers when it produced the 1,4-dioxane containing products—particularly, TCA—at issue in this case. ("Opp. to MTR," ECF No. 73 at 14–15.) Dow reasoned that it manufactured TCA to meet Fedspec and Milspec specifications by stabilizing TCA with 1,4-dioxane. (*Id.* at 9–10.)

As discussed in this Court's Remand Opinion, in order to remove a case based on the federal officer removal statute, 28 U.S.C. § 1442(a), the defendant bears the burden of showing:

> (1) [the defendant] is a "person" within the meaning of the statute; (2) the [plaintiff's] claims are based upon the [defendant's] conduct "acting under" the United States, its agencies, or its officers; (3) the [plaintiff's] claims against [the defendant] are "for, or relating to" an act under color of federal office; and (4) [the defendant] raises a colorable federal defense to the [plaintiff's] claims.

*Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016). The parties agree that Dow is a "person" within the meaning of the statute but disagree as to the remaining three *Papp* factors.

In the present motion, Defendants now contend they have a strong chance of succeeding on federal officer removal grounds because this case will require the Third Circuit's "clarification on the contours" of federal officer removal because the doctrine is to be "liberally construed" and "continues to evolve." (MTS at 6.) The Court is not persuaded.

Defendants are correct that the phrase "acting under" must be construed "liberally." *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 404 (3d Cir. 2021). "But the phrase is not boundless," *id.*, and the Court does not interpret this liberal construction requirement to mandate the extraordinary remedy of a stay of a remand order in every case involving federal officer removal jurisdiction.

As to their argument that the doctrine "continues to evolve," Defendants cite two unpublished opinions from this district. (MTS at 6 (citing *Baker v. A. Clemente, Inc.*, No. 22-02347, 2023 WL 3224586 (D.N.J. May 3, 2023) and *N.J. Dep't of Env't Prot. v. E.I. Du Pont De Nemours & Co.*, No. 19-14765, 2020 WL 2611539 (D.N.J. May 22, 2020)). These decisions do not supplant binding Supreme Court and Third Circuit precedent, which counsel that, for a private party to fall within the contours of the federal officer removal statute, it must have an "unusually close [relationship] involving detailed regulation, monitoring, and supervision" with the federal

government. *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 151 (2007) ("That relationship typically involves subjection, guidance, or control." (citation omitted)); *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 468 (3d Cir. 2015), *as amended* (June 16, 2015) (quoting *Watson*, 551 U.S. at 153) (same). The Third Circuit has also held that a mere "contractual relationship with the government" is not sufficient to demonstrate such a close relationship. *Mohr v. Trustees of Univ. of Pennsylvania*, 93 F.4th 100, 106 (3d Cir. 2024). Rather, a private party "acts as a government contractor when, for example, a manufacturer produced a product for the federal government, doing so 'under the specific supervision . . . of the [government].'" *Id.* (quoting *Papp*, 842 F.3d at 810, 813).

Moreover, the unpublished cases cited by Defendants are factually distinct from the case at bar. Defendants argue that Dow was "acting under" the direction of a federal officer (the second *Papp* requirement) because it sold TCA stabilized with 1,4-dioxane pursuant to contracts with the government. As this Court noted in its Opinion on Plaintiff's Motion to Remand, Dow has not demonstrated the existence of a contract with the federal government requiring products stabilized with 1,4-dioxane. In *Baker*, the defendant alleged the existence of "multiple contracts to produce various chemicals for use by the United States during World War II, according to Governmental specifications, amounts, and timelines." 2023 WL 3224586, at *3. By contrast, in the case at bar, Dow alleged generally that it "previously manufactured certain products containing 1,4-dioxane, including TCA, for use by the United States military." (NOR ¶ 6.) Dow has not expressly alleged or offered evidence of a contract with the federal government that required the use of 1,4-dioxane in the manufacture of products. Another court in this Circuit has found similar language insufficient to demonstrate that a defendant was acting pursuant to a specific government contract.

*See Cnty. of Lehigh v. Atl. Richfield Co.*, No. 18-5140, 2019 WL 2371783, at *7 (E.D. Pa. June 5, 2019), *aff'd sub nom. Cnty. of Montgomery v. Atl. Richfield Co.*, 795 F. App'x 111 (3d Cir. 2020) (finding the allegation that defendant "supplied the federal government with significant quantities of paint products during the time-period in which the federal government specified the use of lead-based paint" insufficient to demonstrate the existence of a government contract for lead-based paint (quoting *Watson*, 551 U.S. at 157)). While Dow's failure to demonstrate the existence of a contract with the federal government for 1,4-dioxane stabilized products is not necessarily fatal to Defendants' position, "in the absence of a contractual relationship with the government, a removing party must provide evidence of a 'special relationship' that is 'distinct from the usual regulator/regulated relationship.'" *See Cnty. of Lehigh*, 2019 WL 2371783, at *7. The record before the Court does not demonstrate that Dow had such a special relationship with the government.

Defendants contend that this special relationship existed because Dow developed its 1,4-dioxane products to comply with federal specifications articulated in MilSpec and FedSpec. At the outset, the Court notes that the Supreme Court has cautioned:

> A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.

*Watson*, 551 U.S. at 153. The Supreme Court explained that the "upshot" is that even a "highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone." *Id.*

Here, the only evidence that Dow has presented of supervision and monitoring by the federal government is a single consultation meeting described in an affidavit from retired employee, Karl W. Hoff. (ECF No. 73-1.) Mr. Hoff attests that he "and others from Dow attended

a meeting with officials from the federal government concerning TCA"; that "[a]t the time of the meeting, [he] understood that the government wanted to publish a new military specification for inhibited TCA"; and that Dow assisted the government in developing the new specification by "provid[ing] the government with technical data regarding the specific gravity and boiling point of inhibited TCA, as well as data on other metrics." (*Id.* at ¶¶ 3–4.) As the Court discussed in its Remand Opinion, a single meeting with the government does not arise to the level of supervision contemplated in cases in which a special relationship has been found.

Moreover, even assuming Dow demonstrated the existence of contracts with the federal government, as stated, a "contractual relationship with the government" is not sufficient to demonstrate a close relationship under the federal officer removal statute. *Mohr*, 93 F.4th at 106. Something more is required. For example, in *Baker*, the defendant alleged that "pursuant to [the federal] contracts[,] it manufactured chemicals that it *had not previously produced*, with the '*sole purpose*' of meeting 'government demand and need.'" 2023 WL 3224586, at *3 (emphasis added). By contrast, here, Dow expressly concedes that it both "manufactured dioxane-stabilized TCA *before* the promulgation of the MilSpec and FedSpec" and that this product was "also available to the public" in addition to the federal government. (Opp. to MTR at 11 (emphasis added).)

Defendant's other cited unpublished decision, *E.I. Du Pont*, arguably fairs better, but nonetheless does not provide strong support for Defendants' position. In *E.I. Du Pont*, the district court considered the third *Papp* factor: whether the plaintiff's claims are "for, or relating to" an act under color of federal office (often referred to as the "nexus" or "causation" requirement). *See* 2020 WL 2611539 at *5; *see also Papp*, 842 F.3d at 813. The court explained that the defendant had not shown that the federal government "controlled the method of formulation" of the products at issue, making the case "distinguishable" from the level of control at issue in the seminal Agent

Orange case of *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008). *Id.* Nonetheless, the court found that the defendant met the third *Papp* factor because the plaintiffs had launched a facial attack and the court was required to take the defendants' allegations in the notice of removal as true, in which the defendant alleged that the manufacturing process of certain materials was done at the behest of the government. *Id.*

By contrast here, Dow cannot allege that it incorporated 1,4-dioxane in its formulation at the behest of the federal government. First, as noted above, Dow was manufacturing TCA inhibited with 1,4-dioxane and selling same to the public prior to the federal specifications. Moreover, MilSpec and FedSpec simply required that TCA purchased by the government be "inhibited." The specifications did *not* require that TCA be inhibited with 1,4-dioxane—Dow's hazardous chemical of choice. Notably, the parties do not dispute that there were other safe and feasible methods to inhibit TCA, such as 1,3-dioxolone. (*See* Compl. ¶ 103; MTR at 22.)

For this same reason, Defendants have failed to demonstrate the fourth *Papp* factor: the existence of a colorable federal defense. *See Papp*, 842 F.3d at 815. Even presuming that Dow had a contractual relationship with the government, Dow has not demonstrated a federal contractor defense because the federal specifications did not prescribe the use of 1,4-dioxane—the specific design feature at issue in this case. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988) (explaining that the "design feature in question" must be considered by the federal officer); *see also Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 71–72 (3d Cir. 1990) (explaining that the defense only applies when the government approved "reasonably precise specifications" and does not apply when "the government rubber stamps a design that a contractor has proposed"). Accordingly, the Court finds that Defendants have not made a strong showing that it is likely to succeed on federal officer removal grounds.

## 2.  FEDERAL LAW CLAIMS

The Court next turns to Defendants' second basis for removal: removal under the *Grable* doctrine, which counsels that federal jurisdiction over a state law claim shall lie if a federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *See Manning v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 772 F.3d 158, 163 (3d Cir. 2014), *aff'd*, 578 U.S. 374 (2016) (describing *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005)). Defendants argue that their appeal has a reasonable chance of success on *Grable* removal grounds because no party has identified a case which has considered the New Jersey Spill Act's reliance on the federal NCP. (MTS at 7.)

First, the Court notes that the burden is on *Defendants*—not on Plaintiffs—to establish federal jurisdiction, and thus to cite legal authority for its invocation of the *Grable* doctrine to remove a Spill Act claim on the basis of the NCP. *Steel Valley Auth. v. Union Switch & Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987) (explaining that the removing party bears the burden of establishing federal jurisdiction). Defendants have provided no such authority. Second, the Spill Act's cabined language that state cleanup "shall, to the greatest extent possible, be in accordance with the [NCP] for cleanup and removal of oil and hazardous substances established pursuant to [the federal Clean Water Act]," N.J.S.A. 58:10-12.11f(a)(3), does not "really and substantially involv[e] a dispute or controversy respecting the validity, construction or effect of [federal] law." *Grable*, 545 U.S. at 313. As the Court articulated in its Remand Opinion, there have been *hundreds* of Spill Act cases adjudicated in New Jersey courts, and the Court finds no basis to conclude that this case is exceptional or raises special issues under the Spill Act. *See MHA LLC v. HealthFirst, Inc.*, 629 F. App'x 409, 412 (3d Cir. 2015) (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006) (explaining that the Grable doctrine applies only to a "'special

and small' category of cases."). Defendants' suggested application of the statute would not only sweep all Spill Act cases into federal court but also would upend the Third Circuit's clear mandate that the *Grable* doctrine only applies in rare cases. *Id.*; *see also Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 750 (9th Cir. 2022), *cert. denied sub nom. Chevron Corp. v. San Mateo Cnty., California*, 143 S. Ct. 1797 (2023) (explaining that "'[o]nly a few cases' have ever fallen into this narrow category." (quotation marks and citation omitted)). Accordingly, the Court finds that Defendants are also not likely to succeed on the merits based on the *Grable* doctrine.[4]

### 3. FEDERAL ENCLAVE JURISDICTION

Lastly, the Court turns to Defendants' contention that this case should be removed under the federal enclave doctrine, which allows removal of any personal injury action which arises from incidents occurring in a federal enclave, or "an area over which the federal government has assumed exclusive legislative jurisdiction through the application of Art. I, Section 8 of the U.S. Constitution." *City of Hoboken v. Exxon Mobil Corp.*, 558 F. Supp. 3d 191, 209 (D.N.J. 2021), *aff'd sub nom. City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022). The parties agree that the relevant standard is whether "all or most of the pertinent events occurred" on federal enclaves and that the focus of the analysis is on the "location of the injury." (NOR ¶ 48; MTR at 38); *see also City of Hoboken*, 558 F. Supp. 3d at 2019 (collecting cases); *Bordetsky v. Akima Logistics Servs., LLC*, No. 14-1786, 2016 WL 614408, at *2 (D.N.J. Feb. 16, 2016). Defendants now argue that the Third Circuit will need to determine whether federal enclave jurisdiction exists in situations such as here, where 1,4-dioxane contamination allegedly began in federal enclaves before rapidly migrating elsewhere. (MTS at 8.)

---

[4] Defendants do not address federal trusteeship in their Motion to Stay and thus, the Court rests on its reasoning in its Remand Opinion that finding that the co-trusteeship at issue in this case requires environmental cases be adjudicated in federal court would significantly disturb the federal-state balance contemplated by *Grable*.

First, the Court notes that it is not at all clear from this record that 1,4-dioxane contamination "began" in federal enclaves before spreading throughout the state. Defendants concede that Dow both sold TCA stabilized with 1,4-dioxane prior to the federal specifications and sold it to the public, undermining their argument that the contamination at issue began in federal enclaves. Presumably, and commonsensically, the contamination began when and where Dow began selling 1,4-dioxane products. Second, Defendants argue that federal enclave jurisdiction should lie because contamination inevitably spreads and thus the damages in this case cannot be limited only to that contamination which exists outside federal enclaves. As discussed in its Remand Opinion, the Court finds this interpretation impermissibly expansive.

Moreover, in their present Motion to Stay, Defendants do not address the fact that Plaintiffs disclaimed any intention of suing over "those natural resources on or underlying federally owned property, such as military facilities." (*See* Compl. ¶ 68.) While the Third Circuit has not expressly addressed such claim disclaimers in the context of federal enclave jurisdiction, the Third Circuit recently upheld the legitimacy of claim disclaimers to defeat federal officer removal jurisdiction. *See City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 713 (3d Cir. 2022), *cert. denied sub nom. Chevron Corp. v. City of Hoboken, New Jersey*, 143 S. Ct. 2483 (2023) (explaining that it is "no ruse" for plaintiffs to "insist that they are not suing over emissions caused by fuel provided to the federal government").[5] Furthermore, other Circuit Courts have found claim disclaimers effective

---

[5] Defendants suggest that they have made a strong showing of likelihood of success on the merits because the Third Circuit has not directly spoken on this issue. (MTS at 7–8; Reply at 7–9.) While there is some facial appeal to this argument, Defendants have not offered any legal authority for this contention. Indeed, it is not unusual for district courts to make decisions absent clear guidance from the Third Circuit on issues directly on point to the issues confronting the district court. As one court put it when considering this very argument in the context of federal officer removal jurisdiction, and ultimately denying a stay of a remand order pending appeal:

> Defendants' argument that there is a "substantial case on the merits" because "there has been no appellate treatment of the issue of federal officer jurisdiction [in the context at issue]," [] is likewise unavailing. That

in defeating federal enclave jurisdiction. *See Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 228 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *Bd. of Cnty. Commissioners of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1271 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1795 (2023); *see also Rhode Island v. Shell Oil Prod. Co.*, 35 F.4th 44, 58 (1st Cir. 2022), *cert. denied sub nom. Shell Oil Prod. Co. v. Rhode Island*, 143 S. Ct. 1796 (2023) (impliedly recognizing the ability of plaintiff to "specially avoid[] seeking relief for damages to any federal lands" and denying federal enclave jurisdiction because not all pertinent events took place on a federal enclave). These Courts, as well as the Ninth Circuit, have also rejected similar arguments to that which Defendants now make regarding the fact that the damages at issue in this case (*i.e.* contamination) easily and inevitably spread. *See, e.g.*, *San Mateo*, 32 F.4th at 750 (rejecting federal enclave jurisdiction when defendants contend that they engaged in conduct on federal enclaves that contributed to global warming causing the rise in sea levels which resulted in flooding to real property and infrastructure elsewhere).

While the Court recognizes that a strong showing of likelihood of success on the merits need not be "more likely than not," Defendants must have a "reasonable . . . probability" of succeeding before the Third Circuit that is "significantly better than negligible." *Singer Mgmt. Consultants*, 650 F.3d at 229; *In re Revel AC, Inc.*, 802 F.3d at 571. Against the guidance from other Circuit Courts and in light of the Third Circuit's recent opinion upholding claim disclaimers, the Court finds that Defendants do not have a reasonable probability of success on federal enclave

---

the issue of federal officer jurisdiction in th[is] context [] is one of first impression on appeal does not render defendants' federal officer claim more colorable.

*Leroy v. Hume*, 563 F. Supp. 3d 22, 28 (E.D.N.Y. 2021).

grounds. Accordingly, on the whole, the Court finds that Defendants have met their burden of demonstrating likelihood of success on the merits.

The Third Circuit has explained that if a movant does not make the requisite showings on *either* of the first two factors (likelihood of success on the merits or irreparable harm), "the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis." *In re Revel AC, Inc.*, 802 F.3d at 571. Accordingly, the Court need not proceed to the remaining factors. *See S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 775 (3d Cir. 2019) ("Deciding this first factor against [the defendant] is, on its own, fatal to the instant appeal . . . Accordingly, we need not—and do not—assess any of the remaining factors."); *Shreenath Holding LLC v. Bezner*, No. 23-1721, 2023 WL 2808165, at *4 (D.N.J. Apr. 6, 2023) (declining to consider the remaining factors when the movant failed to demonstrate likelihood of success on the merits); *In re Supportive Health, LLC*, No. 22-6709, 2022 LEXIS 212558, at *6 (D.N.J. Nov. 22, 2022) ("Whether the second factor tilts [the defendants'] way is largely beside the point, however, because [they have] not demonstrated a likelihood to prevail on the merits.").

### B.   IRREPARABLE HARM

Although the Court need not address the remaining factors, the Court briefly notes, as to the second factor, that Defendants contend that they will be irreparably harmed if "forced to litigate this case in state court during the pendency of an appeal over the very issue of whether this case may proceed in a federal forum" because it would (1) "effectively nullify Dow's statutory right to appeal this Court's decision"; (2) may result in "inconsistent outcomes" if the Third Circuit overturns the Court's Remand Order; and (3) requires Dow to "litigate simultaneously in state court and at the Third Circuit." (MTS at 8–12.)

The Court disagrees and finds the reasoning in *Leroy v. Hume* persuasive, in which a district court in the Eastern District of New York determined the following: (1) confusion from conflicting state and Second Circuit decisions was "speculative at best" because it relied on the assumptions that (a) the Second Circuit would not review the appeal until after the state court reached the merits and (b) that the two courts would disagree; (2) that the defendants' right to appeal was not rendered "nugatory," even if they were "forced to litigate in state court, which federal officer jurisdiction—the basis of their appeal—protects against" again because it was speculative to assume that the state court would reach the merits before the Second Circuit; and (3) duplicative litigation did not warrant a stay because litigation expense does not constitute irreparable injury and any discovery obtained in state court would be relevant to the case even if it ultimately were to proceed in federal court. 563 F. Supp. at 29–30.

One court in this district, citing *Leroy*, similarly found no irreparable harm under these circumstances explaining:

> [E]ven if the Third Circuit decision compels moving the case back to federal court—which is unlikely—any progress made in the state case (e.g. discovery) would also further the federal case. *Leroy v. Hume*, 563 F. Supp. 3d 22, 30 (E.D.N.Y. 2021) ("Any subsequent discovery obtained in state court will be relevant to the case's adjudication even if the case is subsequently removed to federal court. As such, [the Court does] not find litigation of parties' claims in state court to amount to irreparable injury to defendants."). There is little risk of duplicated efforts given the current procedural posture of this case . . . .

*Carre v. All. HC II LLC*, No. 21-20226, 2022 WL 17253590, at *3 (D.N.J. Nov. 28, 2022). Indeed, in this inchoate phase of this litigation, which is before the commencement of what might be a lengthy period of discovery, a cogent and persuasive counterargument is that staying the matter while it is briefed and litigated before the Third Circuit will cause an unfair and extended delay, impeding Plaintiffs from having their case heard in a timely and efficient manner. Thus, any

progress made in state court would only further the federal case if the Third Circuit decides this case should be heard in federal court.

Defendants concede that litigation-related expenses do not constitute irreparable harm. (MTS at 11 (citing *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 23 (1974)); *see also Carre*, 2022 WL 17253590, at *3 ("[L]itigation expense—even a substantial one that cannot be recovered—is not an irreparable harm."). However, Defendants point to *Est. of Maglioli v. Andover Subacute Rehab. Ctr. I*, in which a court in this district determined that the burden of simultaneous litigation combined with the potential for inconsistent outcomes amounted to irreparable harm. No. 21-2114, 2021 WL 2525714, at *7 (D.N.J. June 18, 2021).

The Court finds the reasoning in *Maglioli* less persuasive here. In *Maglioi*, "at the time of the court's decision[,] the case was in a unique posture" distinct from that before the Court in the case at bar. *See Leroy*, 563 F. Supp. at 32 (finding the "unique posture" of *Maglioli* "distinct" from a typical motion to stay execution of a remand order). In *Maglioli*, the defendants initially removed the case to federal court. After the first removal, the court granted plaintiffs' motions to remand, and defendants appealed the remand order. While the appeal was pending, the defendants removed the case a second time on the basis of intervening legal authority. The plaintiffs again moved to remand. The defendants then asked the district court to abstain from ruling on plaintiffs' second round of remand motions while the Third Circuit completed its review of the court's first remand order. *See Maglioli*, 2021 WL 2525714, at *3 (explaining the "unusual" procedural posture of the case). Unlike the present case, where Defendants are, in essence, asking the Court to stay proceedings in *state* court, the defendants in *Maglioli* asked the court to pause its *own* proceedings. *Id.* at *5 (noting that "[t]he exercise of such power [to stay] is particularly appropriate where the outcome of another case may substantially affect or be dispositive of the issues in a case pending

before *a district court*." (citation omitted) (emphasis added)).[6] Accordingly, the Court finds Defendants have failed to demonstrate irreparable harm here.

### C.   APPLICABILITY OF SUPREME COURT PRECEDENT IN *COINBASE*

Finally, the Court addresses Defendants' argument that a stay is required based on the recent Supreme Court decision in *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023). In *Coinbase*, the Supreme Court considered whether the district court must stay its proceedings while an interlocutory appeal is ongoing under Section 16(a) of the Federal Arbitration Act ("FAA"). *Id.*; *see also* 9 U.S.C. § 16(a). Section 16(a) authorizes an interlocutory appeal from the denial of a motion to compel arbitration. The Supreme Court answered that question in the affirmative, determining that "a district court must stay its proceedings while the interlocutory appeal on arbitrability is ongoing." *Id.* at 740. The Court pointed to the principle articulated in *Griggs v. Provident Consumer Discount Co.*, that "[a]n appeal, including an interlocutory appeal, 'divests the district court of its control over those aspects of the case involved in the appeal'" and concluded that the "*Griggs* principles resolve[d] th[e] case." *Id.* at 740–41 (quoting 459 U.S. 56, 58 (1982)). The Court explained that "[b]ecause the question on appeal is whether the case belongs in arbitration or instead in the district court . . . *Griggs* dictates that the district court stay its proceedings while the interlocutory appeal on arbitrability is ongoing." *Id.* at 741. Further, the Court reasoned that "[i]f the district court could move forward with pre-trial and trial proceedings while the appeal on arbitrability was ongoing, then many of the asserted benefits of arbitration

---

[6] The Court also notes that accepting Defendants' interpretation of the irreparable harm requirement would seemingly render all motions to stay a remand order successful: in every case, the defendant could argue that its right to appeal the federal court's jurisdiction was undermined and that proceeding simultaneously in state court would be burdensome and could result in inconsistent outcomes, which contradicts the Supreme Court and Third's Circuit mandate that a stay pending appeal is an extraordinary remedy. *Nken*, 556 U.S. at 427; *Donald J. Trump for President, Inc.*, 830 F. App'x at 389; *Conestoga Wood Specialities Corp. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013) ("Such stays are rarely granted, because in our Court the bar is set particularly high.")

(efficiency, less expense, less intrusive discovery, and the like) would be irretrievably lost . . . Absent a stay, parties also could be forced to settle to avoid the district court proceedings (including discovery and trial) that they contracted to avoid through arbitration." *Id.* at 743.

Defendants argue that although *Coinbase* "involved the denial of a motion to compel arbitration, rather than a remand order, the relevant factors and rationale that led the Supreme Court to mandate a stay of proceedings in that context apply with equal force here: as with a denial of a motion to compel arbitration, a remand order where removal was based on the federal officer removal statute is immediately appealable as of right." (MTS at 14.)[7]

Absent clear guidance from the Supreme Court or the Third Circuit, the Court finds Defendants' proposed interpretation too expansive. As Defendants acknowledge, *Coinbase* pertains to the FAA's statutory right to interlocutory appeal while the issue of arbitrability is ongoing—a context unrelated to the procedural posture of the case at bar. Absent indication from the Supreme Court that its analysis applies to other statutory rights to appeal, the Court cannot find that *Coinbase* governs this case. Such interpretation would be at odds with the Supreme Court's own longstanding precedent that a stay pending appeal is an extraordinary remedy. *Nken*, 556 U.S. at 427; *see also id.* at 437 (Kennedy, J. concurring ("A stay of removal is an extraordinary remedy that should not be granted in the ordinary case, much less awarded as of right.")); *Williams v. Zbaraz*, 442 U.S. 1309, 1311 (1979) (explaining that stays pending appeal are granted only in "extraordinary circumstances"). Had the Supreme Court wanted to overturn this body of case law in *Coinbase*, it would have expressly said so.

---

[7] Under 28 U.S.C. § 1447(d), "[a]n order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise." 28 U.S.C. § 1442 is the federal officer removal statute.

Moreover, Defendants do not cite the Court to a single case in which *Coinbase* has been applied to stay execution of a remand order, and this Court is aware of none. Defendants argue that the absence of authority is inapposite because *Coinbase* "has not yet celebrated its first birthday." (Reply at 13.) The Court, of course, recognizes that *Coinbase* was published just over a year before the date of this Opinion. However, the Court's survey of the case law reveals approximately 60 federal cases applying or citing *Coinbase* thus far.

Of those cases, only two appear to have expanded the Supreme Court's reasoning beyond the context where an interlocutory appeal on arbitrability was ongoing—neither of which mirror the facts in the case at bar. *See United States v. Trump*, No. 23-257, 2023 WL 8615775, at *1 (D.D.C. Dec. 13, 2023) (applying *Coinbase* to stay former President Trump's criminal prosecution pending resolution of interlocutory appeal on the issue of absolute immunity from prosecution); *A.O.A. v. Rennert*, No. 11-44, 2023 WL 8641601, at *1 (E.D. Mo. Sept. 5, 2023) (applying *Coinbase* to stay case pending appeal of denial of defendants' motion to dismiss based on a transnational trade agreement with Peru requiring Peruvian courts to be the exclusive forum for the claims at issue).

The remaining cases either stayed a case due to a pending arbitrability issue under the FAA or declined to extend *Coinbase* to new contexts. *See, e.g.*, *N. Mississippi Med. Ctr., Inc. v. Quartiz Techs.*, No. 23-00003, 2024 WL 2262684, at *7 (N.D. Miss. May 17, 2024) (declining to apply *Coinbase* and denying a motion to stay pending appeal of a denial of a preliminary injunction); *Proto Gage, Inc. v. Fed. Ins. Co.*, No. 21-12286, 2023 WL 9112923, at *2 (E.D. Mich. Dec. 28, 2023) (declining to apply *Coinbase* and denying a motion to stay pending appeal of an order compelling an appraisal); *Miller v. Travel Guard Grp., Inc.*, No. 21-09751, 2023 WL 7106482, at *2 (N.D. Cal. Aug. 1, 2023) (declining to apply *Coinbase* and denying a motion to stay pending

appeal of an order confirming and denying vacatur of an arbitration award pending appeal); *Cf. Wilhoite v. Hou*, No. 23-02333, 2024 WL 2869986, at \*3 (S.D. Cal. June 6, 2024) (staying case pending interlocutory appeal based on defendants' arguments that forum selection clause required suit to be brought in a different jurisdiction and that plaintiffs lacked standing, citing defendants' arguments based on *Coinbase*, but instead applying the discretionary test articulated in *Landis v. N. Am. Co.*, 299 U.S. 248 (1936)).

In fact, in one such case from the Southern District of New York, the defendants requested that the court stay execution of a remand order pending appeal based on *Coinbase* in the exact circumstances presented here: where the basis for removal was the federal officer removal statute. *See Westchester Cnty. v. Mylan Pharms., Inc.*, No. 23-6096, 2024 WL 3043121 (S.D.N.Y. June 18, 2024). The court denied the defendants' motion, finding *Coinbase* "*hardly dispositive*, as 'the sole question before th[e] Court' in that case was 'whether a district court must stay its proceedings while [an] interlocutory appeal on arbitrability is ongoing.'" *Id.* at \*11 n.9 (quoting *Coinbase*, 599 U.S. at 740 (emphasis added)).

Similarly, the Eleventh Circuit denied a defendant's motion to stay a remand order of his criminal prosecution, which was removed on federal officer removal grounds. *See Georgia v. Clark*, No. 23-13368, 2023 2023 U.S. App. LEXIS 34018 (11th Cir. Dec. 21, 2023). First, the court reasoned that "*Coinbase* was limited to arbitration proceedings, which are not at issue here." *Id.* at \*2. Second, the court explained that the *Griggs* principle "animating *Coinbase*" did not apply: "If the *Griggs* principle applied, Clark could perhaps stay his *district* court proceedings—but instead, he seeks a stay of his *state* court prosecution. Neither *Griggs* nor *Coinbase* contemplates this result." *Id.* (emphasis in original).

As the Eleventh Circuit explained, the issue before the Supreme Court in *Coinbase* was whether the district court should stay its *own* proceedings while a court of appeals determined whether the case could proceed in the *district* court. *Coinbase*, 599 U.S. at 741–43. While Defendants disclaim that they are asking the Court to stay state court proceedings—"[t]o be clear, Defendants are not asking the Court 'to stay state court proceedings' . . . [r]ather . . . they seek a 'stay [of] execution of the Remand Order pending appeal'"—they admit that "[s]uch a stay will have the effect of pausing litigation in state court . . . ." (Reply at 15). First, the Court finds this distinction puts form over substance. Second and more importantly, the Clerk of Court has already mailed the transmittal letter to the Superior Court of New Jersey in Mercer County. Thus, as in *Clark*, the gravamen of Defendants' motion is to stay the *state* court proceedings from progressing. As noted above, the Supreme Court relied on the *Griggs* principle that proceedings in the district court must be stayed because an interlocutory appeal "divests the district court of its control over those aspects of the case involved in the appeal." *Coinbase*, 599 U.S. at 740 (citing *Griggs*, 459 U.S. at 58). Here, the Court has already been "divest[ed]" of control over this case "[a]t the moment of mailing" the remand order to the Superior Court. *Agostini*, 729 F.3d at 356 n.2. Under these circumstances, relying on *Coinbase* to stay state court proceedings extends too far.[8]

As a result, Defendants have failed to demonstrate that their requested stay is warranted in this case. *See Leroy v. Hume*, 563 F. Supp. 3d at 32 (denying stay pending appeal of a remand

---

[8] Moreover, the Court notes that the Supreme Court recognized that "the asserted benefits of arbitration (efficiency, less expense, less intrusive discovery, and the like) would be irretrievably lost" were the defendants forced to proceed in the district court in a case which the Court of Appeals ultimately determined should not be heard in court at all. *Coinbase*, 599 U.S. at 743. Allowing a matter to proceed in court would not only deprive the parties of truncated discovery and other prudential efficiencies attendant arbitration, but it would moot any benefit of the bargain of an arbitration clause. Not so here. There is little difference between proceeding in state and federal court at this posture. Unlike in the arbitration context, any progress made in state court—namely, discovery—would also further the federal case if the Third Circuit decides this case should be heard in federal court. *See Carre*, 2022 WL 17253590, at *3.

decision declining to find, *inter alia*, federal officer removal jurisdiction); *Carre*, 2022 WL 17253590, at *3–*4 (same); *Smith v. Colonial Care Ctr., Inc.*, No. 21-494, 2021 WL 1087284, at *9 (C.D. Cal. Mar. 19, 2021) (same); *Thomas v. Century Villa Inc.*, No. 21-3013, 2021 WL 2400970, at *7 (C.D. Cal. June 10, 2021) (denying stay pending appeal of a remand decision declining to find, *inter alia*, jurisdiction under either the *Grable* or federal officer removal doctrines). Accordingly, Defendants' Motion to Stay is **DENIED**.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Stay Execution of Remand Order Pending Appeal, (ECF No. 93), is **DENIED**. An appropriate Order accompanies this Memorandum Opinion.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: July 9, 2024